[Cite as *State v. Hayes*, 2020-Ohio-5322.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190461 |
| | | TRIAL NO. B-1807304 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| DARYLE HAYES, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed as Modified

Date of Judgment Entry on Appeal: November 18, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista Gieske*, Assistant Public Defender, for Defendant-Appellant.

**MYERS, Presiding Judge.**

{¶1}   Daryle Hayes appeals his conviction for arson, in violation of R.C. 2909.03(A)(1).  He argues that his conviction was against the manifest weight of the evidence, that he was deprived of due process due to prosecutorial misconduct during closing arguments, and that the court's restitution order was contrary to law. We affirm Hayes's conviction, but we modify the trial court's restitution order because the victim's parking expenditures were not the direct and proximate result of Hayes's arson offense.

*I.  The Evidence at Trial*

{¶2}   At trial, Melissa Kelley testified that she had known Hayes for 30 years and that they began dating in early 2018.  Hayes had a key to Kelley's apartment and often spent time there.  They dated for about five months.

{¶3}   Kelley testified that on December 23, 2018, at around 7:00 a.m., her neighbor knocked on her door and screamed that Kelley's car was on fire.  When Kelley ran outside, her neighbor's boyfriend was already trying to put the car fire out. Kelley did not know the man's name, and said he was the boyfriend of the woman who lived upstairs from her.

{¶4}   Kelley said that the Christmas gifts she purchased the night before were in the trunk, but she was unable to retrieve them from the burning car.  Kelley testified that the car's tires had been slashed.

{¶5}   Kelley testified that she spotted Hayes "just at the next building."  She saw Hayes running away and saw him get into the front passenger door of a white SUV.  Kelley testified, "And I couldn't chase him, because I needed to get my car, you know."  Kelley said she did not see Hayes's face, but she recognized "his tall self" wearing dark clothing:

The only -- the only way that I knew that that was him, because he bowlegged, and it was -- he was bowlegged. * * * [Y]ou will always remember that walk. * * * And I've been knowing him for 30 years. * * * I know him coming and going.

{¶6} Kelley testified, "I seen a white SUV. I saw the dark figure, bowlegged dark figure, hop in that white SUV."

{¶7} Kelley called 911 at 7:36 a.m. to report that her car was on fire and that the tires had been slashed. She identified Hayes as the perpetrator.

{¶8} The 911 operator asked Kelley if anyone had seen what direction Hayes had gone in, and Kelley asked someone in the background, "Did you see what direction he went in?" Then Kelley told the operator, "He went to the right." The operator asked, "Do you know, was he in a car or was he walking?" Kelley responded, "Um, no he walked off. So I guess he had a car up the street, but he walked off."

{¶9} On direct examination, when asked why she told the 911 operator that he "walked" off, Kelley replied, "I seen Daryle walking down, scurrying on down the walkway. You know -- * * * it was him."

{¶10} Kelley testified that she bought the car, a 2016 Lexus RX350, new for $60,000. She said that nearly $4,000 of damage had been done to her car in the fire.

{¶11} Kelley testified that another neighbor, Kenneth Johnson, came to her home later that day. After they spoke, Kelley gave Johnson the contact information for the fire investigator. Kelley said that she knew Johnson because their dogs played together, but she did not know his last name at the time.

{¶12} On cross-examination, defense counsel asked Kelley why, during the 911 call, she could be heard saying, "Did you see what direction he went in?" if she had seen Hayes leaving. Kelley replied, "I don't know why I asked them. It was a lot

of chaos; my car was on fire." Kelley acknowledged that she told the 911 operator that Hayes had "walked off," and that she had testified on direct examination that he had run off, and explained: "He was scurrying off to the right." She testified that she did not mention to the 911 operator that Hayes had gotten into a white SUV because the operator had not asked her about it. Referring to the 911 operator, Kelley stated, "I was trying to pay attention to her. She saying, Don't go outside, we already outside, putting the fire out." When defense counsel asked if she had been distracted, Kelley responded, "Yeah. Most definitely distracted."

{¶13} Kelley acknowledged that Hayes had sought restraining orders against her in July and October 2018. In those same months, Kelley filed charges against Hayes for violating protective orders previously entered. He was acquitted of these charges. She admitted that she filed a complaint with the Supreme Court of Ohio against the trial judge who acquitted Hayes. She also acknowledged that a rape allegation she made against Hayes had been ignored by the grand jury. And Kelley admitted that she was under indictment for identity fraud involving Hayes.

{¶14} Cincinnati Police Officer Michelle Cameron testified when she and her partner arrived on the scene, the vehicle fire had been put out. She said that the vehicle's back window was shattered and that property in the back of the vehicle was "burnt up."

{¶15} When Officer Cameron spoke to Kelley, Kelley identified Daryle Hayes as the perpetrator. Officer Cameron testified that they went to speak to Kelley's upstairs neighbor who reportedly had seen someone near Kelley's car, but the person was not home.

{¶16} Kelley's neighbor Kenneth Johnson lived in a different building in the same Williamsburg Apartments complex. Johnson testified that he was walking his dog when he heard the sound of breaking glass by Kelley's car. He stated, "So I looked around, and I thought it was a flashlight, but it was bigger than a flashlight. It

4

was something on fire. And then I saw Daryle leaving." According to Johnson, Hayes walked quickly away from the back of Kelley's car. Johnson said that he did not know Hayes's name at the time, but he had previously seen Hayes walking Kelley's dogs. Johnson then went back into his home, and he did not call the police.

{¶17} Johnson said that when Kelley spoke to the police that morning at the fire scene, he "didn't go down there." He testified that later that day, he told Kelley that he had seen Hayes walking away. A few days later, Johnson spoke to a fire investigator and told him that he had seen Hayes walking "from behind the car":

> I told him what I told you, that I saw him walking away. I just heard
>
> the glass break. I didn't know it was Daryle breaking the glass, so I
>
> didn't see him until he walked away. But I saw the light come up, and
>
> it was a flame.

{¶18} When Johnson identified Hayes in a police photo array, he wrote on an accompanying form, "While walking dog heard glass breaking & watch what I first thought flash light was flame[.]" Johnson signed the statement.

{¶19} When Johnson was asked if he had contact by phone or text with Kelley in the days after the fire, he said, "Maybe. I'm not - - I mean, yeah. I don't know." He denied that he spoke to Kelley about "the case."

{¶20} On cross-examination, defense counsel showed Johnson some photographs from Officer Cameron's body-worn camera from the fire scene, and asked Johnson to review them. Johnson replied: "Okay. Is that me? Yeah. I was there. * * * I did walk down there." Johnson said that he was at the scene "[p]robably for a second, but I didn't stay to talk to all of that. It was a neighbor upstairs that she said saw it."

{¶21} Johnson testified that he did not stop and talk with Kelley because there were "[t]oo many police," which meant "[t]rouble coming." Johnson said, "I just don't have a good relationship with them." Johnson testified that he did not

speak to the police at the scene "[b]ecause I don't want to have nothing to do with this. Somebody else was there, somebody else had put out the fire, I guess."

{¶22} Investigator Curtis Chandler with the Cincinnati Fire Department testified that the fire was an act of arson and that the damage from the arson exceeded $1,000. Chandler testified that he interviewed Kelley on the morning of the fire, and that she identified Hayes as the perpetrator. Later, Hayes voluntarily appeared for an interview, in which he denied his involvement and told Chandler he had been at his girlfriend Dorothy Moore's house all day on the date of the fire. Hayes provided Moore's phone number. When Moore failed to appear for a scheduled interview, Chandler was able to use her demographic information to acquire information about her vehicle registration, and he learned that her vehicle was a white SUV. Moore's license plate number was entered into a License Plate Reader "LPR" system.

{¶23} On cross-examination, defense counsel asked Chandler if Kelley "mentioned some things that are on her phone, and you asked to see that phone. Do you remember that?" Chandler said, "I do remember that." Defense counsel asked, "And she did not want to give you her phone, correct?" Chandler replied, "Correct." Chandler agreed that he explained to Kelley the importance of cooperating with investigators and that Kelley told him that she had deleted the information from her phone. Chandler assented that he did not get a search warrant for her cell phone records.

{¶24} On redirect examination, Chandler testified that Kelley did not want to give up her phone because she was a manager at a restaurant and said that it was important to her to have her phone with her to conduct her business.

{¶25} Heather Whitton of the Cincinnati Police testified that she oversaw the city's LPR system which uses cameras that are able to detect license plates. If an LPR camera detects a license plate, it takes a photo of the plate as well as an overview

photo of the vehicle. Those images are cross-referenced against law enforcement data bases.

{¶26} Whitton testified that the city uses about 20 stationary LPR cameras and 18 cameras mounted to patrol vehicles. She said that in this region, which covers 12 counties, there are private vehicles and about 100 patrol vehicles outfitted with the cameras, as well as about 30 static cameras. Whitton testified that there are no static LPR cameras located within a few miles of the Williamsburg Apartments complex.

{¶27} According to Whitton, a vehicle detection report indicated that an image of a white SUV with Moore's license plate number was captured by an LPR camera mounted on a private vehicle on December 23, 2018, at 10:36 p.m., within a few miles of the Williamsburg Apartments.

{¶28} The state rested and the defense presented no evidence. The jury found Hayes guilty of arson. The trial court sentenced Hayes to three years of community control and, following a hearing, ordered him to pay restitution in the amount of $1,128, for Kelley's $500 automobile-insurance deductible, $500 renter's-insurance deductible, $50 car-rental expenditure, and $78 parking expenditures. Hayes now appeals.

## II. Manifest Weight of the Evidence

{¶29} In his first assignment of error, Hayes argues that his conviction was against the manifest weight of the evidence. He contends that the jury lost its way when it reconciled the conflicting evidence in favor of the state.

{¶30} In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

{¶31}  Hayes argues that Kelley's and Johnson's testimony was not credible, that Chandler's investigation did not properly test their reliability, and that the evidence relating to the white SUV was inconclusive.

### A.  Kelley's Credibility

{¶32}   Hayes argues that Kelley's prior use of the court system against Hayes diluted her credibility.  Defense counsel thoroughly  cross-examined Kelley about her history of court filings and charges against Hayes, so that the jury was able to use that information in determining her credibility.  And in closing argument, defense counsel walked through the timing of each of Kelley's filings against Hayes and argued that Kelley "knows how to weaponize the Court system to try to get what she wants."  He also argued, "We've gotten the legal past of Ms. Kelley:  the filing, after filing, after filing, after filing that she has done to try and get a conviction on Mr. Hayes."   Therefore, the jury was able to weigh Kelley's credibility in light of her previous use of the court system.

{¶33}  Next, Hayes points out that Kelley was admonished numerous times by the trial court to confine her testimony to the questions asked and to stop inserting gratuitous commentary.  However, Hayes did not assign as error the trial court's failure to control Kelley as a witness.  Nonetheless, the court's admonitions to Kelley were made in the jury's presence, so the jury could weigh them in assessing Kelley's testimony.

{¶34}  Hayes also argues that there was an unexplained 36-minute lapse between the time that a neighbor knocked on Kelley's door at 7:00 a.m., and Kelley's 911 call at 7:36 a.m.  Kelley testified that the neighbor knocked at "about" 7:00 a.m., and Johnson was asked to tell the jury what happened "around" 7:00 a.m.   Defense counsel argued this discrepancy in closing, so the jury was able to consider the evidence as to the timing of the call in relationship to the report of fire.

**{¶35}** In addition, Hayes argues that there were inconsistencies between Kelley's statements to the 911 operator and Kelley's testimony at trial as to whether Hayes walked or ran from the burning car, as to Kelley's identification of Hayes by his tall, bowlegged frame despite not having seen his face, and Kelley's not having told the 911 operator that Hayes had gotten into a white SUV. Defense counsel explored these inconsistencies during cross-examination and argued them in closing, so the jury was able to weigh them in considering Kelley's credibility.

### B. Johnson's Credibility

**{¶36}** Hayes argues that Johnson was not credible because he initially denied being at the scene of the burned car despite photos from Officer Cameron's body-worn camera showing that Johnson was there. The jury heard defense counsel's cross-examination of Johnson on the issue and defense counsel argued this inconsistency in closing: "Then why is [Johnson] on the body cams standing right next to [Kelley]?" The jury, therefore, was able to weigh these inconsistencies when evaluating Johnson's credibility.

**{¶37}** Hayes further argues that Johnson's claim that he and Kelley did not discuss the case was belied by cell-phone records indicating that they had spoken 38 times in the days following the fire. However, those records were not admitted into evidence, and both Kelley and Johnson denied that contact. When asked if she had 38 contacts with Johnson between December 25 and January 4, Kelley said, "I don't know if I did or didn't. * * * I don't see how I would call him that many times." Defense counsel asked Johnson, "You said when your dog gets out * * * is when you contact Ms. Kelley. So between December 25th and January the 4th, did your dog get out 38 times?" Johnson replied, "Hell no." Counsel asked, "So these records are wrong too?," and Johnson replied, "If I called her, it's wrong. It might be butt dialed, but not no 38 times." In closing, defense counsel argued, "once they realized I had phone records, there had to be some explanation. And Mr. Johnson had that locked

9

and loaded by the time he got to the stand." Accordingly, the jury was able to weigh Johnson's testimony about his contacts with Kelley.

### C. The Investigation

**{¶38}** Hayes argues that Chandler's investigation unfairly targeted him from the start. He points to Chandler's failure to obtain written statements from Kelley or Johnson and his failure to obtain Kelley's cell phone records when she refused to hand over her phone. However, defense counsel explored these matters on cross-examination and argued them in closing, so the jury could assess the weight to be given to Chandler's testimony.

### D. The White SUV

**{¶39}** Hayes argues that, at most, the LPR evidence established that a white SUV registered to Moore was tracked somewhere in the vicinity of Kelley's apartment within 15 hours of the fire. Defense counsel cross-examined Whitton about the evidence and argued in closing: "This white SUV that was seen somewhere in the vicinity, 15 hours later, at night, on the road that is not in question, with a driver that we cannot see and had no idea if there's a passenger," and "This is the best they have to try to put Mr. Hayes in the area some 15-and-a-half hours later in a car that is not his in a location that is irrelevant to this case." The jury heard the evidence and defense counsel's cross-examination of Whitton and closing argument, and was able to assess what weight to give the evidence.

### E. Conclusion as to Manifest Weight

**{¶40}** Overall, the jury was in the best position to judge the credibility of the witnesses. *See State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 165, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The jury was entitled to weigh the evidence, consider the motivations of the witnesses, and elect to believe all, part, or none of the

testimony offered. *See State v. Williams*, 1st Dist. Hamilton No. C-180574, 2020-Ohio-1367, ¶ 36. This was not the rare case in which the jury lost its way and committed such a manifest miscarriage of justice in convicting Hayes that his conviction must be reversed. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We hold that Hayes's conviction for arson was not against the manifest weight of the evidence. We overrule the first assignment of error.

### III. Prosecutorial Misconduct

{**¶41**} In his second assignment of error, Hayes argues that prosecutorial misconduct during closing argument deprived him of a fair trial. He asserts that the prosecutor improperly vouched for witnesses and misrepresented evidence. However, except where noted, defense counsel failed to object and waived all but plain error. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 237. To prevail on a claim that the trial court committed plain error, Hayes must show that (1) an error occurred, (2) the error was obvious, and (3) it affected the outcome of the trial. *See State v. Kirkland*, Slip Opinion No. 2020-Ohio-4079, ¶ 71-72.

{**¶42**} The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *State v. Madison*, Slip Opinion No. 2020-Ohio-3735, ¶ 177, quoting *Smith v. Phillips*, 455 U.S. 209, 212, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

### A. Vouching

{**¶43**} Improper vouching occurs when a prosecutor implies knowledge of facts outside the record or places her or his personal credibility in issue. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 145. A prosecutor

11

may not express a personal belief or opinion as to a witness's credibility. *Id.* However, a prosecutor may comment on "considerations that the jury could properly consider in evaluating [a witness's] credibility: his demeanor, consistency, and opportunity to observe, as well as the extent to which other evidence corroborated his testimony." *Id.* at ¶ 147. None of the instances cited by Hayes constituted error, let alone plain error.

{¶44} Hayes points to prosecutor's remarks describing Kelley as "earnest," "passionate," and "theatrical," and telling the jury to focus on the facts rather than her credibility. The prosecutor pointed out Kelley's theatrics and said if "that's all you had to judge her credibility, * * * I mean, I know what your decision would be, but I'm going to ask you to keep your mind open and just think about the actual facts that we know." The prosecutor did not vouch for credibility and instructed the jury to focus on the evidence.

{¶45} Hayes next directs us to the prosecutor's comment that if Kelley was going to lie, then she "could have told a better lie." The prosecutor argued that if Kelley was going to falsely implicate Hayes, she could have added further embellishment to her version of the events by saying that she saw Hayes at her car and spoke to him, rather than simply saying she saw a bowlegged man. The comment was in response to the defense attacks on Kelley's credibility and did not express the prosecutor's personal view of her credibility.

{¶46} Finally, Hayes argues that the prosecutor dismissed Kelley's "contradictory testimony regarding seeing Mr. Hayes walk out of the complex versus seeing him jumping into a white SUV as a 'mistake' rather than a lie." The prosecutor asked the jury to consider whether it was Kelley's intent to omit information in her 911 call or whether she made a mistake in omitting it, stating, "That's for you to decide." This comment did not express the prosecutor's personal opinion of her credibility. No plain error occurred.

### B. *Misrepresentation of the Evidence*

**{¶47}** Hayes argues that the prosecutor misrepresented the evidence in several instances. First, to quote Hayes's brief, "The prosecutor then submitted that, if Mr. Johnson were going to lie, why not explicitly say he saw Daryle Hayes walking away from the scene of the fire? Quite simply, *he did.*" However, this is a misreading of the record.

**{¶48}** The prosecutor stated:

[I]f Mr. Johnson is going to lie, why wouldn't he say instead of, I was walking Cookie, I heard glass breaking, then I turned, I saw what appeared to be a flashlight, but then it sort of flamed up. Daryle Hayes walked away, went away.

If [Johnson] was going to lie, why wouldn't he just say, I saw Daryle walk up, break the glass, set the car alight.

**{¶49}** The prosecutor's point was that Johnson said that he saw Hayes walking away from the fire, but that, if Johnson were going to lie to further implicate Hayes, he could have added that he saw Hayes walk up to Kelley's car, break the glass, and set the fire. The prosecutor did not misstate Johnson's testimony.

**{¶50}** Next, Hayes argues that the prosecutor misrepresented the evidence when he said that Johnson wrote a statement. However, the prosecutor referred to the statement that Johnson wrote in connection with the police photo array. That signed statement was entered into evidence, and the prosecutor properly commented on it.

**{¶51}** Hayes also argues that the prosecutor misstated the evidence as to how the investigator learned that Hayes's girlfriend drove a white SUV. The prosecutor argued that Hayes himself had told the investigator that his girlfriend had a white SUV. Defense counsel objected, stating, "I don't believe that's what the testimony was." The trial court overruled defense counsel's objection. Because Hayes objected,

we apply a harmless-error standard of review. *See State v. Jones*, Slip Opinion No. 2020-Ohio-3051, ¶ 18. Under the harmless-error standard, the state must demonstrate that the error did not affect the substantial rights of the defendant, that is, that the error did not affect the outcome of the trial. *Id.*

{¶52} Although the prosecutor incorrectly stated that Hayes provided the investigator with the information that his girlfriend drove a white SUV, the information that Hayes provided led to the investigator's discovery of that information. To the extent that an imprecise statement about the evidence was made, the trial court addressed the issue by instructing the jury that the arguments of counsel were not evidence and that the jurors were the sole judges of the facts. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 211; *Kirkland*, Slip Opinion No. 2020-Ohio-4079, at ¶ 117, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987) (jury instruction that closing arguments are not evidence contributed to determination that prosecutor's improper statements did not deny a fair trial). Therefore, the prosecution's statement, and the court's error in failing to sustain defense counsel's objection to the misstatement, was harmless.

### C. Conclusion as to Prosecutorial Misconduct

{¶53} After reviewing the prosecutor's closing argument in its entirety, we hold that, although the prosecutor made a misstatement, the statement in no way permeated the state's argument so as to deny Hayes a fair trial. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 203. Consequently, we overrule the second assignment of error.

### IV. Restitution

{¶54} In his third assignment of error, Hayes argues that the trial court's restitution order was contrary to law and that the payment terms were unclear.

{¶55} The trial court conducted a restitution hearing at which Kelley testified. The state submitted into evidence a vehicle repair statement that verified

14

Kelley's out-of-pocket responsibility under her automobile policy was a $500 deductible. The defense did not dispute the propriety of awarding restitution in the amount of $500.

{¶56} However, the defense disputed the evidence offered by the state as to Kelley's claims that she paid a $500 deductible under her renter's insurance policy for damage to the items of personal property that were destroyed in the fire, $50 for car rental, and $78 for parking fees. At the conclusion of the hearing, the trial court ordered Hayes to pay $1,128 in restitution, stating, "This amount reflects the victim's two insurance deductibles, rental expense, and parking fees."

{¶57} Hayes argues that to the extent the restitution order exceeded the $500 automobile-insurance deductible, it was not supported by the record and must be modified. We review the imposition of restitution as part of a felony sentence to determine whether the sentence complies with R.C. 2953.08 in that it is not contrary to law. *State v. McNear*, 1st Dist. Hamilton No. C-190643, 2020-Ohio-4686, ¶ 7, citing *State v. Thornton*, 2017-Ohio-4037, 91 N.E.3d 359, ¶ 12 (1st Dist.).

{¶58} A court may impose restitution as part of a felony sentence "in an amount based on the victim's economic loss." R.C. 2929.18(A)(1). The amount ordered as restitution "shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." *Id.* R.C. 2929.01(L) defines "economic loss" as follows:

> "Economic loss" means any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any loss of income due to lost time at work because of any injury caused to the victim, any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense, and the cost of any accounting or auditing done to determine the extent of loss

15

if the cost is incurred and payable by the victim. "Economic loss" does not include non-economic loss or any punitive or exemplary damages.

**{¶59}** First, Hayes argues that Kelley's $500 renter's insurance deductible was not supported by documentation. However, Kelley testified that she paid a $500 deductible and she did not have the receipts for the items that were damaged in the fire because she had submitted them to her renter's insurance company. She testified that her total claim had been for more than $3,200, but the insurer had given her only $1,618. The state introduced into evidence a document from Kelley's renter's insurance company that established she had been paid $1,618.03 for the loss but did not state what deductible, if any, she paid. A victim is not required to provide documentation to verify her economic loss. *See State v. Daniels*, 2015-Ohio-5348, 45 N.E.3d 266, ¶ 34-35 (1st Dist.); *State v. Jones*, 10th Dist. Franklin No. 15AP-45, 2015-Ohio-3983, ¶ 16 ("a restitution order may be supported by the victim's testimony alone without documentary corroboration"). The relevant statute provides that "[t]he court may base the amount of restitution it orders on an amount recommended by the victim." R.C. 2929.18(A)(1); *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, paragraph one of the syllabus. Therefore, the trial court had an evidentiary basis to support the $500 restitution order for Kelley's renter's insurance deductible.

**{¶60}** Next, Hayes asserts that the rental expense and parking fees were indirect losses, not subject to restitution because they were not suffered by the victim as a direct and proximate result of the commission of the offense. "Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *McNear*, 1st Dist. Hamilton No. C-190643, 2020-Ohio-4686, at ¶ 8, quoting *State v. Lovelace*, 137 Ohio App.3d 206, 216, 738 N.E.2d 418 (1st Dist.1999). For example, in *Lalain*, the

16

Supreme Court of Ohio held that a victim company's expenditures for the valuation of property that had been stolen and later recovered and for time spent by company employees preparing for the criminal case were not the direct and proximate result of the defendant's commission of the theft offense. *Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, at ¶ 25. The court held that the expenditures were "consequential costs incurred subsequent to the theft to value the property that had been take from and later returned" to the company. *Id.*

{¶61} Here, Kelley testified that she paid $50 for a car rental while her fire-damaged car was being repaired. She asserted specifically that the rental fee was related to her not having a car as a result of the defendant's action. Because Hayes's arson offense necessitated Kelley's having to rent a car while her car was repaired, her car rental expenditure was a direct and proximate result of the offense. *See State v. Perkins*, 3d Dist. Marion No. 9-13-52, 2014-Ohio-2242, ¶ 26 (noting that, even if a victim's property is returned, the victim could recover other costs in restitution, such as costs to rent replacement property until the stolen property was returned). Accordingly, we hold that the trial court properly awarded Kelley $50 for her car rental expenditure.

{¶62} However, the same cannot be said about Kelley's parking expenditures. Kelley testified that she paid $13 each time she parked "down here," "including today for this," presumably referring to her court appearances related to Hayes's arson case. These parking fees are indirect costs and not the direct and proximate result of Hayes's commission of the arson offense. Therefore, we hold that the trial court erred by awarding Kelley $78 restitution for her parking expenditures, and we sustain Hayes's third assignment of error in part and overrule it in part.

{¶63} Next, Hayes argues that the deadline set by the trial court for payment of restitution is unclear. However, we do not address the issue because Hayes can seek clarification on the deadline from the trial court.

## *V. Conclusion*

**{¶64}** Consequently, we modify the trial court's restitution order to $1,050 and affirm the judgment in all other respects.

Judgment accordingly.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.