[Cite as *State v. Smith*, 2024-Ohio-5168.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

STATE OF OHIO,                          :

                                 :

    Plaintiff-Appellee,                 :          Case No.  22CA17

                                 :

    v.                                  :

                                 :          <u>DECISION AND JUDGMENT</u>

EDWARD T. SMITH,                        :          <u>ENTRY</u>

                                 :

    Defendant-Appellant.                :

                                 :

_____

<u>APPEARANCES:</u>

Mallorie A. Thomas, Patituce & Associates, LLC, Strongsville, Ohio, for Appellant.

Alison L. Cauthorn and James E. Schneider, Assistant Washington County Prosecuting Attorneys, Marietta, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Edward Smith appeals the judgment entry of the Washington County Court of Common Pleas entered September 8, 2022.  Smith was convicted by a jury of one count of Theft in violation of R.C. 2913.02(A)(2)/(B)(1)(2), a felony of the fourth degree.  Smith raises nine assignments of error challenging his conviction.  Upon review, however, we find no merit to Smith's assignments of error.  Accordingly, we overrule Smith's assignments of error and affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

{¶2} On December 12, 2019, the Washington County Grand Jury returned a single count indictment against Edward Smith, (hereinafter "Smith,") alleging theft, in violation of R.C. 2913.02(A)(2)/(B)(1)(2), a felony of the fourth degree.  On December 17, 2019, Smith entered a not guilty plea and was released on his own recognizance.  Smith, a contractor, owns Bottom Line Construction, LLC.  The indictment stemmed from a dispute between Smith and Dan and Susan Hale.

{¶3} Mr. Smith proceeded to a jury trial which occurred on June 14, 2022.  The evidence at trial demonstrated that the Hales' dispute with Smith was intertwined with another dispute which had arisen between Smith and Sand Hill United Methodist Church (the "church").  The Hales attended Sand Hill United Methodist Church where Mr. Smith had been the chosen bid for a steeple or "bell tower" project (the "project").  Dan Hale, the president of the board of trustees for the church, was the contact person between Smith and the church.  On November 16, 2016, the church provided Smith with a check for $33,100 as down payment on the church project.

{¶4} In January 2017, Mr. and Mrs. Hale met with Smith at their home on Nelson Street in Marietta to discuss replacing their roof.  Smith estimated a total cost of $24,900 for the Hales' project and requested down payment in the amount of $12,450.  On January 31, 2017, the Hales

provided Smith a cashier's check for $12,450. Smith deposited this check in his company account.

{¶5} The reason for the provision of the $12,450 check from the Hales to Smith was the key issue of the criminal trial. As the church project proceeded, the church struggled with funding and communications broke down between Smith and the church. On November 11, 2018, the church sent Smith a letter canceling the contract with Mr. Smith and his company.

{¶6} Meanwhile, neither Mr. Smith nor anyone on behalf of Bottom Line Construction ever performed work on the Hales' home or delivered materials to them in anticipation of work. On January 24, 2019, the Hales sent Smith a letter canceling their roofing job and requesting return of their money. Smith never returned to Hales their check for $12,450.

{¶7} The Hales contacted the Marietta Police Department in February 2019. Detective Sergeant Ryan Huffman contacted Smith, who admitted the Hales gave him $12,450, but told Huffman that, it was "all part of the church job." Detective Huffman investigated further and eventually concluded that the dispute between Mr. and Mrs. Hale and Mr. Smith was a criminal matter.

{¶8} Dan Hale and Edward Smith, along with others, testified at trial. Several documentary exhibits were introduced into evidence. The crucial exhibits were an estimate provided by Smith and a cashier's check provided

by the Hales.  The matter largely turned upon the credibility of Mr. Hale and

Mr. Smith.  On September 2, 2022, Smith was convicted of theft and

sentenced to a term of 120 days in jail, with five days of jail time credit, and

five years of supervised probation.  He was also ordered to pay restitution to

victims Dan and Susan Hale in the amount of $12,450, as well as fines and

court costs.

{¶9} Smith timely appealed.  Additional procedural facts and

testimony of the witnesses will be set forth below.

## ASSIGNMENTS OF ERROR

I.     THE STATE COMMITTED MULTIPLE ACTS OF
       PROSECUTORIAL MISCONDUCT PURSUANT TO
       BRADY V. MARYLAND IN VIOLATION OF
       APPELLANT'S RIGHT TO A FAIR TRIAL UNDER
       THE SIXTH AND FOURTEENTH AMENDMENTS.

II.    THE TRIAL COURT ERRED BY FAILING TO ORDER
       THE STATE TO TURN OVER APPELLANT'S
       PROPERTY, THUS DENYING APPELLANT HIS
       CONSITUTIONALLY PROTECTED RIGHT TO
       PRESENT A DEFENSE IN VIOLATION OF THE
       SIXTH AND FOURTEENTH AMENDMENTS.

III.   THE STATE ENGAGED IN PROSECUTORIAL
       MISCONDUCT DURING CLOSING ARGUMENTS
       THAT DEPRIVED APPELLANT OF HIS RIGHT TO A
       FAIR TRIAL AS GUARANTEED BY THE SIXTH AND
       FOURTEENTH AMENDMENTS.

IV.    THE TRIAL COURT ERRED WHEN IT FAILED TO
       GRANT APPELLANT'S MOTION TO DISMISS
       WHEN APPELLANT'S RIGHT TO A SPEEDY TRIAL

WAS VIOLATED AFTER HE WAS NOT BROUGHT TO TRIAL IN THE TIME REQUIRED BY LAW.

V.    THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO DISMISS A JUROR WHEN THAT JUROR WAS OBSERVED COMMUNICATING WITH THE VICTIM DURING TRIAL.

VI.   TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO PURSUE THE REMOVAL OF THE JUROR WHO WAS OBSERVED COMMUNICATING WITH THE ALLEGED VICTIM DURING TRIAL.

VII.  APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

VIII. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.

IX.   THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE DEPRIVED APPELLANT OF HIS CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL.

{¶10} We begin with consideration of Smith's fourth assignment of error.

ASSIGNMENT OF ERROR FOUR –
SPEEDY TRIAL

A.  STANDARD OF REVIEW ON MOTION TO DISMISS

{¶11} On August 10, 2021, Smith filed a Motion to Dismiss for Failure to Have a Speedy Trial.  On September 22, 2021, the trial court denied the motion.  Smith's trial finally commenced on June 14, 2022.

Smith asserts that upon initiation of the underlying proceedings, 454 days elapsed prior to his trial, well in excess of 270 days as provided by Ohio statute.  Smith has asserted both statutory and constitutional speedy trial violations.

{¶12} " 'Appellate review of a trial court's decision on a motion to dismiss for a violation of the speedy trial requirements presents a mixed question of law and fact.' " *State v. Brooks,* 2018-Ohio-2210, ¶ 21 (4th Dist.), quoting *State v. Spencer,* 2017-Ohio-456, ¶ 16 (4th Dist.); *State v. Baugh*, 2018-Ohio-857, ¶ 71 (5th Dist.).  " 'Thus, appellate courts will defer to a trial court's findings of fact as long as competent, credible evidence supports them.' " *Brooks, supra,* quoting *Spencer* at ¶ 16, citing *State v. Brown*, 131 Ohio App.3d 387, 391 (4th Dist.1998).  " 'Appellate courts then independently determine whether the trial court properly applied the law to the facts.' " *Brooks, supra*; *Spencer* at ¶ 16.  And when reviewing the legal issues in a speedy trial claim, we must strictly construe the statutes against the state.  *Brooks, supra.  See Brecksville v. Cook,* 75 Ohio St.3d 53, 57 (1996); *Spencer* at ¶ 16; *State v. Deacey,* 2017-Ohio-8102, ¶ 75 (2d Dist.).

## B.  LEGAL ANALYSIS

{¶13} The Sixth Amendment to the United States Constitution

(which is made applicable to the states through the Due Process Clause of the Fourteenth Amendment) and Article I, Section 10 of the Ohio Constitution guarantee a criminal defendant the right to a speedy trial. This guarantee is implemented by R.C. 2945.71, which provides specific statutory time limits within which a person must be brought to trial. *Brooks, supra,* at ¶ 23; *State v. Blackburn,* 2008-Ohio-1823, ¶10. "R.C. 2945.71(C)(2) 'requires that a person against whom a felony charge is pending shall be brought to trial within 270 days after the person's arrest.' " *Brooks, supra,* quoting *State v. Adams*, 2015-Ohio-3954, ¶ 81.

{¶14} We begin with consideration of Smith's statutory speedy trial rights. When computing any period of time prescribed by an applicable statute, the date of the act or event from which the period begins to run is not included. *State v. Fisher,* 2012-Ohio-6144, ¶ 14 (4th Dist.); *State v. Alexander,* 2009-Ohio-1401, ¶ 18 (4th Dist.), citing *State v. Saffin,* 2008-Ohio-338, ¶ 9 (4th Dist.). " 'Time is calculated to run the day after the date of arrest.' " *State v. Miller*, 2012-Ohio-1263, ¶ 9 (9th Dist.), quoting *State v. Brownard,* 2007-Ohio-4342, ¶ 12 (9th Dist.).

{¶15} Smith was originally arrested in September 2019, but the case was dismissed. He was later indicted in December 2019. By the time of the filing of Smith's August 10, 2021 motion, 704 days had elapsed. Because

the 270-day period was exceeded, Smith presented a prima facie speedy trial

violation.  *See Brooks, supra,* at ¶ 24; *State v. Smith*, 2017-Ohio-7864, ¶ 21

(4th Dist.), citing *State v. Squillace*, 2016-Ohio-1038, ¶ 14 (10th Dist.).

Once a defendant establishes a prima facie case for dismissal, the burden

shifts to the State to prove that the time was sufficiently tolled to extend the

period.  *Brooks*, at    ¶ 24; *Smith* at ¶ 21, citing *Squillace* and *State v.*

*Anderson,* 2016-Ohio-7252, ¶ 19 (4th Dist.).

{¶16} " 'R.C. 2945.72 contains an exhaustive list of events and

circumstances that extend the time within which a defendant must be

brought to trial.' " *Brooks,* at ¶ 25, quoting *State v. Ramey,* 2012-Ohio-

2904, ¶ 24.  The State of Ohio and Smith agree that through May 4, 2020,

166 days of speedy trial time elapsed.[12]  The defense had moved for a

continuance due to the COVID 19 pandemic, which was granted on May 4,

2020.  The trial was continued to June 23, 2020.  Beginning our calculations

on May 5, 2020, the speedy trial clock was tolled until June 23, 2020 for 50

days.

{¶17}The case was again continued, due to the pandemic, on

---

[1] The trial court set forth its calculations as to the time tolled in its decision on Smith's motion to dismiss. Since the parties are not in dispute on this point, we do not find it necessary to discuss herein.

[2] Smith also agrees that upon the parties' agreed motions to continue on January 5, 2022, speedy trial time was tolled until the trial date in June 2022.

the court's own motion of June 16, 2020.  A new trial date of September 22, 2020 was established.  However, the case had previously been continued to June 23, 2020, so we begin our count at June 24, 2020.  Between June 24, 2020 and September 22, 2020, 90 days elapsed.  Smith claims this tolling period is an error of the court.  We disagree.

{¶18} The COVID 19 pandemic tolling event served to extend the speedy trial time.  The trial court's entry reads:  "Upon the Court's own Motion, and due to the COVID 19 pandemic, the above-styled case currently set for June 23-25, 2020 jury trial is continued."  The Supreme Court of Ohio noted in *State v. Lynum (In re Fleegle)*, 2020-Ohio-5636:

> [A]ll Ohio judges have been advised, trial judges have the authority to continue trials for defendants on a case-by-case basis without violating speedy-trial requirements. *Id.* at ¶ 7.

{¶19}We also noted the Supreme Court's pronouncement above in *State v. Dixon,* 2022-Ohio-2807 (4th Dist.):

> "[T]rial judges have the authority to continue trials for defendants on a case-by-case basis without violating speedy-trial requirements * * * courts may suspend jury trials to prevent the spread of the coronavirus and they may do so consistent with state and federal speedy-trial obligations." *State v. Morant,* 2021-Ohio-3160, ¶ 27 (7th Dist.) citing *Fleegle, supra*, 2020-Ohio-5636, at ¶ 7; 2020 Ohio Atty.Gen.Ops. No. 2020-002; Ohio Supreme Court Coronavirus Resources.

*Dixon,* at ¶ 65.  The trial court's June 16, 2020 sua sponte order notes only that the matter was continued due to the COVID 19 pandemic.  Upon our review of the record, we observe that Smith's case was transferred to a different judge on June 12, 2020.  While the case had been previously continued on the basis of the pandemic, we presume that the new judge assigned to the case properly followed the law in continuing the matter again on that basis.  We find the continuance was reasonable in purpose and length and tolled the speedy trial clock.  Smith's first contention is without merit.

{¶20} On September 3, 2020, defense counsel moved to continue the trial date due to a scheduling conflict.  Counsel's motion was granted on September 14, 2020, and a new trial date set for January 11, 2021.  Because the matter had previously been scheduled for September 22, 2020, we begin our count on September 23, 2020.  The speedy trial clock was stopped between September 23, 2020 and January 11, 2021 for a total of 111 days.[3]

{¶21} On January 4, 2021, the trial court ruled on Appellant's

---

[3] After this time, defense counsel filed a motion to withdraw as counsel on October 7, 2020.  This motion was granted on October 23, 2020.  Defendant was given 15 days to obtain new counsel.  On November 17, 2020, the defendant pro se filed a motion to continue the trial date.  He also advised that he could not afford counsel, appealed the decision allowing his attorney to withdraw and filed a motion to dismiss his case on two separate grounds.  None of these occurrences affect the speedy trial count as the matter had been continued for jury trial on January 11, 2021.

October 7, 2020 and November 17, 2020 motions and converted the January 11, 2021 trial date to a hearing date. On January 11, 2021, Defendant appeared without counsel. Thereafter, the trial court continued the matter until February 9, 2021 for a pretrial conference in order to allow the defendant to file a financial affidavit. Beginning our count at January 12, 2021 to February 9, 2021, 29 days elapsed.

{¶22} Smith's next contention is that the trial court erred by finding that time was tolled between February 9, 2021 and May 18, 2021. On its own initiative by entry filed January 12, 2021, the trial court continued the jury trial date to May 18, 2021. Beginning our count on February 10, 2021, the time elapsed up to May 18, 2021 was 98 days.[4] Smith argues this continuance was not reasonable. We disagree.

{¶23} We find that R.C. 2945.72, extension of time for hearing or trial, is applicable. The statute provides as follows:

> (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon the accused's request as required by law;

> (D) Any period of delay occasioned by the neglect or improper act of the accused * * *.

---

[4] Further, on April 21, 2021, defense counsel filed a suggestion of incompetence, a plea of not guilty by reason of insanity. Counsel also filed and renewed motions to withdraw as counsel. On May 3, 2021, the trial court put on an entry ordering Appellant to undergo a competency evaluation. On May 13, 2021, the trial court put on another order that Appellant must attend his previously scheduled evaluation. These motions did not affect the speedy trial clock as the matter was continued to May 18th. The competency report was filed on June 3, 2021.

{¶24} Smith ignores the reasons of his own making that caused the need for continuance and were discussed in the trial court's January 12, 2021 entry as follows:

> This matter came on for hearing on January 11, 2021, pursuant to a Court order filed January 4, 2021, requiring Defendant Edward T. Smith to appear with retained counsel, or with a completed financial affidavit so that the Court could determine defendant's ability to afford counsel. Present in open Court were Defendant Edward T. Smith, without counsel, * * *. Upon inquiry by the Court the Defendant advised that he has not retained counsel, and that he does not want to file an Affidavit pertaining to his finances without counsel reviewing it with him first. * * *. The Court then ORDERS that Attorney Chandra Ontko be appointed to represent the Defendant to counsel with him about the financial affidavit, and to assist defendant in completing it for filing with the Court. * * * The Court further ORDERS that the Financial Affidavit is to be completed and filed with the Court by Monday February 1, 2021.

{¶25} As the record demonstrates, Smith's initial trial counsel had filed a motion to withdraw for the reasons listed below, which had been granted months before in October of 2020.[5] Smith was without counsel for a substantial period of time. New defense counsel, which turned out *not* to be Attorney Ontko, was to be appointed on February 9, 2021. It was only reasonable for the trial court to give new counsel an opportunity to review

---

[5] The reasons listed in this motion citing irretrievable breakdown of the attorney-client relationship were allegations of: (1) use of offensive and profane language directed at counsel; (2) posting of false information regarding counsel on the internet; and (3) threats directed at counsel.

Smith's case and prepare for trial. Even if the trial court had not sua sponte continued the matter, it is likely that Smith's new counsel would have requested a continuance. We find no merit to Smith's second contention.

{¶26} The matter was thereafter continued between May 19, 2021 to June 3, 2021, when the competency evaluation was filed. During this time, 15 days elapsed. On June 8, 2021, at a hearing on the pending motions, Smith's current attorney was allowed to withdraw and by entry dated June 11, 2021, the trial was rescheduled to October. New counsel was not appointed until July 23, 2021. Regardless of the appointment, the trial date was previously continued to October 12, 2021. Smith's final challenge is to assert that the clock resumed on July 2 through July 23, 2021. This is incorrect. The matter was already continued through October 12, 2021. Furthermore, when Smith's counsel was allowed to withdraw in June and Smith did not obtain new counsel until mid-July, Smith was without counsel by his own fault. New counsel certainly would have needed preparation time for the October 2021 trial. Smith's third contention is without merit.

{¶27} On August 10, 2021, Appellant's new counsel filed a motion to dismiss on speedy trial grounds. Between June 12, 2021 and August 10, 2021, 60 days elapsed. In summary, between September 6, 2019 and August 10, 2021, 704 days elapsed. However, adding the days elapsed when the

speedy trial clock was stopped, the total number of days elapsed is 619 days. Subtracting 619 days elapsed from 704 total days, the number of days counting toward speedy trial time is 85 days, well within the 270.

{¶28} Furthermore, we need not consider any time beyond the August 10, 2021 motion date because Smith did not renew his motion to dismiss. In *State v. Salser,* 2020-Ohio-1000, (5th Dist.), appellant contended that he had received the ineffective assistance of counsel due to counsel's failure to renew a motion to dismiss based upon speedy trial grounds due to the passage of 122 days from the trial court's denial of the initial motion to dismiss until the subsequently scheduled trial date. The court noted that while appellant did file a motion to dismiss based upon a speedy trial violation in March 2019, he did not raise the issue of the delay subsequent to the decision denying his first motion. The *Salser* court observed:

> A defendant cannot raise speedy trial for the first time on appeal. *City of Worthington v. Ogilby,* 8 Ohio App.3d 25, (10th Dist.1982) paragraph 2 of the syllabus as quoted in *State v. Vance*, 2004-Ohio-258, ¶ 45 (5th Dist.).

*Salser,* at ¶ 25. *See also, State v . Berry*, 1999 WL 43217, (10th Dist.) (Where Appellant did not re-assert motion alleging he was denied his right to speedy trial, appellate court concluded that appellant waived the issue).

{¶29} Based on our review of the record, as set forth above, we find the trial court properly applied the law and competent credible evidence

supports the trial court's denial of Smith's motion to dismiss. As such, we find no merit to Smith's argument that his statutory speedy trial rights were violated.

{¶30} Furthermore, we find no constitutional violation. In *State v. McDougald*, 2022-Ohio-3191,¶ 13 (4th Dist.), this court observed:

> To determine whether there has been a denial of a defendant's constitutional right to a speedy trial, the court considers four factors identified in *Barker v. Wingo*, 407 U.S. 514, 523 (1972): "(1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant." *State v. Hull,*2006-Ohio-4252, ¶ 22, citing *Barker* at 530, 407 U.S. 514. No single factor controls the analysis, but the length of the delay is important. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* at 530, 407 U.S. 514. Generally, a delay that approaches one year is presumptively prejudicial. *Doggett v. United States,* 505 U.S. 647 (1992), fn. 1. *Accord, State v. Long*, 2020-Ohio-5363, ¶ 14.

{¶31} Beginning with the first and second factors, we observe that while in this case the delay appears to be presumptively prejudicial, the reasons for the delay, notwithstanding the COVID 19 pandemic, are substantially due to Smith's own conduct, as referenced above. At one point, the trial court described Smith's behavior as "contumacious." The record supports this description and we find the record demonstrates that

Smith's own conduct was the cause of most of the delays throughout the trial court proceedings.

{¶32}The only factor in Smith's favor is that he did assert his right to speedy trial on August 10, 2021.  As to the fourth and final factor, we cannot find that Smith was prejudiced due to the delay in bringing him to trial.  If anything, the delay gave Smith more time to prepare.  Again, analyzing Smith's argument under a constitutional analysis, we find the trial court properly applied the law and competent credible evidence supports the trial court's decision to deny Smith's motion.  Thus, we also find no constitutional violation of Smith's speedy trial rights.  Based on the foregoing, Smith's fourth assignment of error is without merit and is hereby overruled.

{¶33}Because we find it helpful to have the trial testimony set forth early on in this opinion, we next consider Smith's seventh and eighth assignments of error.

### ASSIGNMENTS OF ERROR SEVEN AND EIGHT- MANIFEST WEIGHT OF THE EVIDENCE AND  SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

{¶34} A claim of insufficient evidence invokes a due process concern

and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Wickersham,* 2015-Ohio-2756, ¶ 22 (4th Dist.), citing, *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins,* syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins,* 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶35} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *Wickersham, supra,* at ¶ 23; *State v. Hill,* 75 Ohio St.3d 195, 205 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-

evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did.  *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484 (2001).

{¶36} " 'Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.' " *Wickersham, supra,* at ¶ 24, quoting *Thompkins,* 78 Ohio St.3d at 387.  " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.  Weight is not a question of mathematics but depends on its effect in inducing belief." ' " *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 12, quoting *Thompkins,* 78 Ohio St.3d at 387, quoting Black's Law Dictionary 1594 (6th ed.1990).

{¶37} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses.  The reviewing court must bear in mind, however, that

credibility generally is an issue for the trier of fact to resolve. *Wickersham, supra,* at ¶ 25; *State v. Issa,* 93 Ohio St.3d 49, 67 (2001); *State v. Murphy,* 2008-Ohio-1744, ¶ 31 (4th Dist.). " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya,* 2006-Ohio-6312, ¶ 6 (2d Dist.), quoting *State v. Lawson,* 1997 WL 476684, *4 (2d Dist.). As the *Eastley* court explained:

> " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts.
> *14 * * *. If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 2012-Ohio-1282, ¶ 24 (4th Dist.); accord *State v. Howard,* 2007-Ohio-6331, ¶ 6 (4th Dist.), ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶38} Once the reviewing court finishes its examination, the

court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, " ' "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered ." ' " *Wickersham, supra,* ¶ 26, quoting *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).  A reviewing court should find a conviction against the manifest weight of the evidence only in the              " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting *Martin,* at 175; *State v. Lindsey,* 87 Ohio St.3d 479, 483 (2000).

{¶39} When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction. *Wickersham, supra,* at ¶ 27; *State v. Pollitt*, 2010-Ohio-2556, ¶ 15 (4th Dist.).  " 'Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *State v. Lombardi,* 2005-Ohio-4942, ¶ 9 (9th Dist.), quoting *State v. Roberts*, 1997 WL 600669, *5.   Therefore, we first consider Smith's argument that his theft conviction is against the manifest weight of the evidence.

## B.  LEGAL ANALYSIS

{¶40} The trial testimonies of Dan Hale and Edward Smith were

lengthy. Some facts are not disputed. Both Hale and Smith testified they met as a result of the church's contract with Smith. Smith initially quoted a price of $60,200. The church also wanted an aluminum porch added, with tile to match the steeple, which was quoted at an additional $6,000. Smith required that 50 percent of the total cost be paid up front.

{¶41} Both witnesses testified that when the contract between Smith and the church began, the church's financing was not actually in place. Mr. and Mrs. Hale initially loaned the church $17,000 so that the church could pay Smith an initial check of $33,100 to get the project on his schedule. The cost for replacing the rotted posts was over and above the original contract. Smith continued to request more funds and the financing delays led to work delays.

{¶42} Dan Hale and Ed Smith began the church project with good rapport but the delays led to a breakdown in communications and eventually another church member began dealing with Smith in Hale's place. While there is much testimony about the church's contract with Smith, we are mindful that the ultimate issue in this case is whether or not Smith committed a criminal act by refusing to return the Hales' $12,450 check. The following is a summary of the testimony of the prosecution witnesses.

1. Dan Hale

{¶43}  Hale is a lifelong member of the church and chairman of the board of trustees.  Mr. Hale testified there were numerous conversations and texts between Smith and himself.  The church wrote numerous checks to Bottom Line Construction and Hale gave Smith many of them at the church.  Mr. Hale identified State's Exhibit E-1 as the estimate prepared for the church project dated November 22, 2016.  The church's address was at the top of the exhibit with Dan Hale's name and phone number as contact person.  The bottom of the estimate reflected that $30,100 was half of the full price.  It also said "materials are 50 percent."  Ed Smith's signature and initials were on the estimate.  The estimate also reflected that the first half of the money had been paid.

{¶44}  Mr. Hale testified he and his wife Susan were having problems with their own roof and ceilings and in December 2016, asked Smith about doing some work at their home.  Sometime in January 2017, Smith texted and asked "to go up and take a gander at it."  Smith came to the Hales' residence, inspected the problem areas, and gave them some ideas.  Smith came by a second time and the Hales showed Smith pictures.  Smith quoted them a price of $24,900 and advised they would need to give him half the money up front to secure the project.  Smith said he'd schedule their project

for immediately after the church project.  Hale knew the church was having

problems obtaining its loan.

{¶45}  Hale identified State's Exhibit A as a cashier's check for

$12,450 from Settler's Bank, dated January 30, 2017 and written to "Ed

Smith- Bottom Line Construction," which represented the first half of

payment for the roof job at the Hales' home.  Hale testified as follows:

> Ed came that evening. * * * We agreed to a price. * * *
> We wanted to put another type of a roof on the front of our
> house.  We have just a ranch style house.  We wanted a
> small porch.* * * We was going to have gutters put on.
> We would have had to have had a drain line ran from the
> upper part of the house down to the road, * * *.

Hale continued:

> Next thing you know, Ed was like, okay, now I have a
> question.  And his question was, he wanted some more
> money from the church.  And at that time, I told him, I
> said, well, Ed, we've already gave you half the money.  He
> said, well, I need some more.  And I said, well, would this
> help you out, if we gave you half our money up front?  And
> that's what we done, * * *.  So we figured that, we've
> already gave you half the money, you know.  But he
> needed some more, so that was when me and my wife,
> well, would this help you out, if we gave you half of ours
> up front?  Yes.  And I'll make sure you're on the schedule.
> You'll be the next one after the church is over.

Hale's testimony emphasized that the payment was for their own roof

project, not the church's project, "but it was to help him out at the moment,

because you know the church wasn't - - hadn't yet secured their loan."

However, Smith did not give them a written estimate at that time.

{¶46}  In April 2017, when Smith and Hale were at the church, Smith gave Hale the estimate for the home roof project, identified as State's Exhibit B.  Hale testified the listed work to be performed was different than what they had discussed with Smith in January.  For example, the estimate contained nothing about the gutter work.  Moreover, the estimate did not reflect that the Hales had already paid Smith $12,450 in January.  Nothing on the estimate referenced the church project.

{¶47}  Thereafter, disagreements and delays between Smith and the church continued although the church's loan was eventually approved.  The trustees invited Smith to a September 5, 2017 meeting at the church in order to discuss "wrapping up the project."  The Hales, Pastor Rick Carpenter, Jerry Stevens, Karen Brown, and Eric Knowlton were in attendance. Specifically, Smith was asked:  (1) when the job would be completed and (2) what the final payment amount owed to Smith would be.  The trustees also generally discussed the repayment of the  $12,450 to the Hales.  Mr. Hale testified:

> If I can go back, we had a telephone conversation a few
> days before that, trying to come up with a price, and that
> was where the price came to that day of September 5th.

Ed wanted $10,150. * * * Which would have made the total amount when he was completed at $12,450.

{¶48} Shortly after the meeting, the church gave Bottom Line Construction a check for $10,150 dated September 14, 2017. Hale testified after the $10,150 payment to Smith for the church project, they agreed final amount due to Smith upon completion was $12,450. Hale testified that Smith told him that when the church job was completed and he received the $12,450, he would repay the Hales. However, the church project was still unfinished in July 2018.

{¶49} The Hales' roof job was never started. Hale testified neither Smith nor anyone on his behalf performed work at their home or delivered materials. Smith never returned the $12,450 deposit. The Hales sent Smith a letter dated January 24, 2019, by regular and certified mail, requesting their money back. Smith never responded. When Hale met with Officer Ryan Huffman, Hale provided his cell phone so Huffman could extract the calls and texts involving Ed Smith.

{¶50} The prosecutor called attention to text No. 522 in April 2017:

A:     Oh. This is me to Ed. * * * Spent from noon till four
       o'clock cleaning up water at the church again today.
       More drywall fell while we were there. * * * As for
       us, we have the money, but I want it all wrote out in
       a contract, so I can compare notes with what we
       talked about.

* * *

Q:      And now, what was - - the next line, 523?

A:      Okay.  This is from Ed to me.  Did I not give you a copy yet, question mark.

Q:      And might that have been in response to, when you said you wanted a contract?

A:      That's correct.  A contract for my place, yeah.

Q:      All right.  And then look at 524.

A:      524 from me to Ed.  You took our money and I assume cashed it.  That is all we have, other than a verbal agreement.  Do you have a record of what we have already given you, question mark.

Q:      Now look at line 525.

A:      From Ed to Dan.  I would have to look it all up.  But I did type up a contract for your roof back when we agreed to it, that I have a copy of, yes.  Will get you a copy next week.

Q:      Now look at line 526.

A:      This is me to Ed.  I assume you have the picture of the porch roof that Susan gave you, question mark.

Q:      If you recall, was that in relationship to the porch roof at your house on Nelson Avenue, or the church porch roof?

A:      No, this would be the - - my house roof on Nelson Avenue.

{¶51}  The prosecutor also questioned Hale about a text conversation

on August 4, 2017 in which Dan Hale told Smith that the Hales were

deciding whether to get the roof done or their money returned. By that time, they had received the estimate on the home roof job. However, the estimate did not accurately reflect the work they had discussed with Smith or reflect that they had paid Smith half the money.

{¶52} On cross-examination, defense counsel attempted to show that the Hales never had a written or even verbal contract with Smith for a home roof project. Hale admitted giving Smith $12,450 at the church to help out with the church project. He admitted that there were no text messages during the ten-day period around January 31, 2017, when he gave Smith the $12,450 check. Hale admitted that the estimate Smith gave them did not reflect that he had paid $12,450. Hale denied, after giving Smith the check that he said "we'll settle up later with the church" or "sort it out later with the church." Hale denied making that implication to Smith. Hale admitted the contracts with the church were signed and indicated payments had been made.

## 2. Eric Charles Knowlton

{¶53} Mr. Knowlton testified he was a church member and served as finance chairman. He knew about the church's loan delay. Knowlton testified the Hales wrote a check to the church on November 16, 2016 to help cover the church's first check to Smith and Bottom Line Construction

in the amount of $33,100 check.  Thereafter, the Church paid back the Hales

the money they contributed.

{¶54} Knowlton identified and authenticated State's Exhibits  F-1

through F-8 as checks written for the Project to Bottom Line Construction

from the church's account with People's Bank.  Knowlton signed the checks.

We set them forth as follows:

F-1, dated November 22, 2016 in the amount of $33,100;

F-2, dated February 16, 2017, in the amount of $10.000;

F-3, dated March 3, 2016, in the amount of $5,500[6]

F-4, dated April 7, 2017, in the amount of $7,500;

F-5, dated July 27, 2017, in the amount of $3,000;

F-6, dated August 6, 2017, in the amount of $4,500;

F-7, dated August 22, 2017, in the amount of $1,250;

F-8, dated September 14, 2017, in the amount of
$10,150.

These amounts total $75,000 paid from the church to Smith's company.

3.   Karen Brown

{¶55}  Ms. Brown testified she was a member of the board of trustees

---

[6] This check was posted on March 6, 2017 and the testimony was that the date it was written was incorrect.

and church custodian.  Smith and his workmen had access to the church for the restroom and for storage.  Brown was present at the September 5, 2017 meeting with Smith when he requested more funds from the church.  Brown testified as follows:

> Q:     Toward the end of that meeting, did you hear Mr. Smith make any other statements regarding Dan Hale or Susan Hale?
>
> A:     The way I understood it was, is once the church paid Mr. Smith, Mr. Smith would then pay Mr. and Mrs. Hale.
>
> Q:     All right.  And you * * * heard that from Ed Smith?
>
> A:     Yes.

   4.        Rick Carpenter

{¶56}  Mr. Carpenter pastored the Sand Hill United Methodist Church from July 1, 2016 until June 30, 2020.  Pastor Carpenter knew about the project, loan delays, and the Hales' loan to the church.

{¶57} Pastor Carpenter attended the September 5, 2017 meeting of the church council with Ed Smith.  The purpose of the meeting was to try to get Smith to finish the church job and to discuss the church's final payment.  Pastor Carpenter knew that the Hales had dealings with Smith for their own residential roof project.  Carpenter testified:

> Q:     And do you recall any statements that Ed Smith made during that meeting concerning Dan and

> Susan Hale on a personal level, as opposed to the church position?

A:    Yes. * * * Not word for word, but about him owing them money for the down payment they made for him to do work on their house.

Q:    All right.

A:    And concern about, we would pay them instead of him.

{¶58} After the meeting, Pastor Carpenter received a phone call from Smith which he described as follows: "* * * was about us paying Dan and Sue instead of paying him. And I told him, we cannot do that. We have a contract with him. If we paid them, we would still have to pay him." Counsel continued:

Q:    All right. So he was wanting to make sure that when he finished the job - -

A:    We would have paid him.

Q:    - - the church was going to pay him?

A:    Yes.

Q:    And let him settle up with the Hales.

A:    Correct.

Q:    And you assured him this was the church's position as well.

A:    Yes, I did.

* * *

Q:     Did the - - at any time, did Ed Smith in these
       conversations discuss with you the fact that he felt
       because of his dealing with Dan and Susan Hale that
       the church owed them the $12,450.

A:     No.

Q:     Did he ever suggest that to you?

A:     No, he was just concerned that we would pay them
       and not him.

{¶59}  On cross-examination, Pastor Carpenter admitted there were

no audio recordings of the church meetings, just secretarial notes.  Defense

counsel inquired:

Q:     In your testimony, finally, you do admit that
       the money that we're talking about here, that the
       Hales gave to Bottom Line Construction, this
       check that we talked about, you know, giving them
       back, that Mr. Smith, through Bottom Line
       Construction was supposed to give them back, this
       agreement that he was supposed to give them back
       this money, that that money was actually used in
       the church project.  Isn't that true?

A:     The money from the Hales?

Q:     Correct.

A:      That was their personal money for their
       personal business.  It had nothing to do with the
       church.

Q:     So it's your belief that money was not used in the
       church project?

A:    The church paid everything out of their accounts. Everything paid from the church, came from church accounts.  That money was a separate contract with the Hales and Mr. Smith.

## 5. Detective Sergeant Ryan Huffman

{¶60} In February 2019, Detective Huffman spoke with the Hales who explained their dispute with Smith and provided documentation.  Mrs. Hale later provided detailed notes of meeting with Smith and Mr. Hale provided his cell phone.  Huffman's initial impression was that it could be a civil matter.  While the Hales were in his office, Huffman made a phone call to Smith hoping to quickly resolve the matter.  Smith was given the opportunity to explain his side of the dispute.

{¶61} At this point, the prosecutor played State's Exhibit N.  We set forth several excerpts as follows:

Detective:   Ed, hey, this is Sergeant Huffman down at Marietta P.D. * * * You got a couple of minutes?

Smith:    Sure.

Detective:   I just sat down with Dan and Susan Hale. * * * Basically, they brought forward the issue with the payment for $12,450 they did back in 2017, and the job not being basically - - the job at the church and the job in Marietta are two separate, different things.  So the only one I'm concerned about is the job at the house.

Smith:      They - -- they didn't make a payment. * * *
            They made a payment for their church.

Detective:  * * * The only one I'm concerned with now
            is their house.  In 2017, when they gave you
            the cashier's check as half down, and then
            nothing happened, and there was basically
            an agreement that you were going to refund
            their money.

Smith:      No, not true.* * * That's not true. * * * No,
            if they want to * * * cause problems about
            that a year later, they can take * * *

(End of clip. Recording paused.)

Detective:  * * * They came in here and met with me
            today.* * * You did the job at the church,
            and then you contracted to do a slate job at
            their house.

Smith:      That is not - - no, sir.  No, sir.  They * *
            * talked about a shingle job at their house,
            But * * *.  There was no contract, never was
            under no contract.  The was no contract on a
            project at their home.  You are
            misinformed.* * * There is no contract on
            the property at - -

Detective:  Correct.  They brought in a - - they brought
            in a copy of the contract in that you - -

Smith:      They brought in a copy of an estimate. * * *
            They have an estimate on that house and
            nothing more.  They never entered * * * a
            contract on that home. * * * Look, we are
            going to court with the church, and they - -
            they aren't as friendly as they seem. * * *
            They're not as honest as they seem.

(End of clip.  Recording resumed playing transcribed as follows:) * * *

Smith:          I got fired from a job that they- - that Dan hired me to do on a church. * * * And that is it. (End of clip. Recording resumed playing, transcribed as follow:)

Detective:      So, what I got in front of me, maybe - - it's what you're referring to as an estimate - - was for 24- - 9 to do - - that job at his house, at 108 Nelson Avenue.  And then I have a copy of the cashier's check, which they paid 24-5 [sic], which would have been half down for that job.

Smith:          That was a payment that Susan made for the church, because the church was behind on their payment.  That is not a payment they made for a roof contract at their house, and they have no signed con- - (End of clip. Recording resumed playing, transcribed as follows:)

Smith:          - - contract at their house, like the * * * church does for the church.  No, sir.

Detective:      So are you going to have some kind of documentation?  Because they've got a bunch of text messages.

Smith:          I sure do. * * * I've got a whole file of documentation on the Sand Hill - - (End of clip.  Recording resumed playing, transcribed as follows:)

Smith:          There's no documentation on Dan Hall [sic]. * * * There's no job for Dan Hall.

Detective:      Well, here's my problem * * * Ed, is you're

saying that whatever sheet they have here is an estimate.  And the estimate say, 50 percent - - (overtalking )- - they said - - (overtalking) - - they - - hold on, don't interrupt me, I don't interrupt you.  They say the estimate is for 12 - - 50 percent down was $12,450, and then I got a copy of the cashier's check for $12,450 to you from them.  Now, they said there's communication and where you all talk about that money being refunded - -

Smith:      No, they - -

Detective:   - - because they're canceling the job.

Smith:      They had sent me a letter telling me that they want money refunded - -(End of clip. Recording resumed playing, transcribed as follows:)

Smith:      - - and they've harassed me since they fired me from the church. * * * That's the only job I've ever been fired from in a nine-year career. * * * This is absolutely ludicrous.

Detective:   * * * So if you're telling me you've got some communication between you and Dan or Susan, * * * I would love to see them, disputing the fact that this $12,450 was 50 percent down on their house.

Smith:      They don't have anything saying it was down on their house. * * * There's nothing saying that payment was for their house * * * .

Detective:   So then basically what's probably going to happen is, I'm probably going to have to sit down * * * I'll start going through the stuff

that they got, and then I'll call you.  And then- -

Smith:      I'm going to pull the file from the church and everything that will have * * *communications between Susan and Dan, and I'm going to forward that to my attorney. * * *

Detective:    [W]hat we'll do is, if we can arrange a meeting with you and your attorney, we'll just sit down and * * * see if * * * we can hash this out.  And * * * if you can convince me that the $12,450 payment you received from them was for the church - -

Smith:      Ask Susan by herself.

Detective:    - - instead of their house.  What's that?

Smith:      I feel like Susan's an honest woman, but Dan's a liar. * * * Ask Susan by herself if that payment was to be used for the church I - - I – between you and me, I – Dan is - -
(End of clip.  Recording resumed, playing, transcribed as follows:)

Smith:      - - he lied to my face, he lied to the company, he lied to his own church. * * * In front of the whole congregation behind the pulpit.  Dan Hale is a liar.  Susan Hale, I feel in my heart, that she is an honest woman. * * *Ask her by herself if that money is to be used for the church. * * * Not when she's sitting next to her 300 pound husband.

Detective:    * * * [H]ere's what they told me, that your last payment, the church was to make to you, was for the exact amount you owed them.  And when I say owed them it was, it

was a repayment of $12,450 for the money that they had already paid you to do their house.

Smith:  They gave the church a  loan, because the church got behind on the money.  The church defaulted, now they're coming after me. (End of clip.  Recording resumed playing, transcribed as follows:)

Smith:  This is totally- -

Detective:  Well if they gave the church a loan, why is the - - this cashier's check in your name?

Smith:  Well, the churches' payments come from multiple sources, and something when you deal with - - there's you get checks from their insurance companies, you get churches from their mortgage companies - -that's where they come, to keep the contract rolling. (End of clip.  Recording resumed playing, transcribed as follows:)

Detective:  All right, Ed.  Well, I would gather up anything you can gather up - -

Smith:  I appreciate the phone call.

Detective:  * * * [I]f you can show me something * * * for your side, you know, * * * that's what I want to do.  And then if you can show me something then this becomes completely civil and I'm out of it.

Smith:  Fine.  Fair enough. * * * I'll get my attorney to review everything and put something together * * *.  (End of clip.  Recording resumed playing, transcribed as follows:)

Detective:   And they're * * * being polite in here, and they said * * * we're not trying to say anything bad about him, the business, or anything like that.  We just * * * want our money back.

Smith:       I'm not wrong.  I'm not - - and I don't mean to sound argumentative, but this just - -

Detective:   Yeah, Ed, listen.  I just literally, you know, got this so I * * * have no judgment on anybody * * *. (End of clip.  Recording resumed playing, transcribed as follows:)

Smith:       I am no thief, sir.  I'll prove it to you. * * * I've been in business for nine years and I've completed every job I've ever contracted. * * * Sometimes that means I have to do it myself.  I'm in construction.  The crews go belly up, whatever, I don't.

Detective:   Yeah.  Okay.  All right.  Well, I'll look forward to hearing from you and you can give me that information.  Okay.

Smith:       Yeah. Thank you.

{¶62}   Huffman testified that after the initial phone call, Smith called him once and advised that his attorney would be contacting Huffman with Smith's own information regarding the jobs.  Huffman testified he waited nine days until reaching out to Smith again who told him "that is was civil and hung up on me."  Smith's attorney never contacted Huffman or provided supporting documentation.

{¶63} After this, Huffman contacted the Hales' witnesses and obtained a copy of the check. He subpoenaed the financial records for Smith and Bottom Line Construction and was able to track the check to its deposit into Smith's account. Smith's bank records showed the check was deposited into an account with Smith's home address. Huffman also identified Joint Exhibit 1, the Cellebrite extraction report which reflected text messages between Dan Hale and Ed Smith. On cross-examination, Huffman admitted that nothing on the check indicated it was a down payment on the house job.[7]

{¶64} The State offered its exhibits into evidence and rested. These exhibits will be set forth below. Smith's attorney made a Crim.R. 29 motion arguing that there was no evidence of a contract between the Hales and Smith and no evidence that the $12,450 payment to Smith was anything other than a contribution or loan to the church project. The trial court denied the motion.

{¶65} The following are summaries of the defense witnesses. The testimony of Edward Smith was very lengthy and focused mainly upon the church project and Smith's displeasure with the funding delays. Smith also

---

[7] The State also presented testimony from Montell Hutchison, a member of the Church council, who sent letters to Smith on behalf of the Church. Her testimony did not shed light on the dispute between Smith and the Hales so we have not included it.

testified about the day the Hales handed him the $12,450 check.  We have

attempted to streamline the lengthy testimony, while giving a flavor for what

the jurors experienced at trial.  The trial court admonished Smith several

times during his testimony, instructing him to give yes and no answers and

to refrain from arguing with the court or counsel.

1. Edward Smith

{¶66} Mr.  Smith testified he is a contractor licensed in Ohio and

West Virginia.  He owns Bottom Line Construction, LLC.[8]  Smith testified

he is not a thief and he did not use the Hales' money in any way in which he

was not authorized.  He takes pride in his work and his business.

{¶67}  Smith testified that Defendant's Exhibit 14 was a description

of the church's request for replacement of the slate on the bell tower.  Smith

testified, however, that upon his inspection of the work, he discovered the

posts upholding the bell tower were rotted and the heavy slate could have

fallen.  It was a danger to the congregation and an unhealthy work

environment.  Smith told the church trustees that "what you want is to put on

a Band-Aid when you need stitches.  You guys want to give it a facelift and I

---

[8] Exhibits 6, 7, 8, 9, 10, 11, 12, and 13 were Smith's business documents as a licensed contractor. Exhibit 6, his Occupational Safety Health Administration (OSHA) card; Exhibit 7, First Aid certification; Exhibit 8, Ohio Bureau of Workers Compensation (BWC) certificate; Exhibit 9, West Virginia contractor's license issued in 2016; Exhibit 10, West Virginia contractor license issued in 2018; Exhibit 11, Articles of Incorporation from the Ohio Secretary of State; Exhibit 12, Application for articles of incorporation; and Exhibit 13, Ohio Secretary of State document for Bottom Line Construction, an active LLC.

mean, you need Botox." Without replacing the posts, he was not interested in the project. Ultimately, Smith's bid was chosen, he was given an initial down payment, and also give various payments by check until funding became a problem.

{¶68} Smith testified that Dan Hale was dishonest with him about the church's loan. Smith explained, "They had been out of money. I wasn't going to do any more work until * * * that issue was resolved." On January 31, 2017, Dan Hale called him and said he wanted Smith to bring his crew, "ready to work. * * * We got to continue this. We're in this together now." Smith testified about the conversation with Hale as follows:

> Ed, I've got a plan. And Dan had - - Dan was the man. I mean, that's exactly what they call him, Dan the man. He - - if somebody's got a problem, they go to Dan. He fixes it. Dan saves the day. At his church, he is looked at as Dan the man. * * *And, I said, Dan, I really don't think it's a good idea for you guys to go further in the hole, and your loan's already been denied multiple times for various reasons that I could get into. They're a little more detailed than what he has let on here as well. Nonetheless, he said that he had considered this and he had a plan. * * * [H]e asked me to meet him at the church and he brought his wife with him.

{¶69} Thereafter, the three met under the car port at the church. Smith testified:

> They wanted me to continue working on the church. Dan was putting funds into the church out of his own pocket, and - - because the loan project hadn't gone through. * * *

Out of better judgment, I should have filed suit against the church and parted ways with them right then. * * * But Dan the man and his wife Susan offered to save the day again. They came up to me, and Susan was on my left and Dan was on my right. And they were standing side-by-side. And Dan had a check in his hand, the check in question. * * *[H]e said, hey we're sorry - - I'm sorry, he apologized for the delays. The work is looking great. I really sincerely want you guys to go on. I've put a little money into this project I don't want everybody to know about. Okay. He's like, and I'm willing to put more into it. * * * He handed the check * * * to Susan, and he said, she has something she wants to say. * * * People don't normally put on a show when they make a payment. But in this case, they did. * * * And she said, Ed * * * we've prayed about this, and we know what we want you to do. Your guys are here. We have $12,450. How long will that get us? That's not a lot of money in the business world when you've got a crew of five guys out there, dump trailers, mobile office, 120-foot boom lift costing you $4500 a week. Scaffolding set up for months. * * * [H]e didn't want the project to stop on the church, because then he would have had to explained to the church that they didn't get the loan. And Dan was the man and he didn't want to admit to making any mistakes in front of his congregation.

Smith continued:

In these extraction reports, I mention to him at least once * * * that if he doesn't tell the truth, I will go Sunday morning myself and I will take the pulpit, or I will stand outside under the awning and I will let the church members know that they are out of money and they don't have the money to pay for this project. But to forego that, Dan and his wife said, take this money, continue the project. The loan will be finalized Thursday, and then we will get the money back from the church. You can get your final payment- - your next payment. * * * And I said, yeah, Dan, you know, I can do this, but you got to keep the

checks coming. * * * But I, I was looking at her, Susan's face. And she had this very serious look on her face. She, she knew what she came to do that day. * * * I put my hand out and I took ahold of the check. But in this case, instead of just handing me a check nonchalantly, she kept a hold of it. She kept it in her hand. And she said, Ed, take this, use it this week to keep the project going. We're going to get this taken care of on Thursday. Everything will be worked out. We have prayed about this, and this is what we want you to do. And she kept a hold of it. There was a pause. And then I said, okay, that's what I'll do. She released the check. * * * I said, let's do it. * * * and we worked till * * * about Friday.

Smith testified, "That's not the way you make transactions, unless there's something attached to it. So they wanted to give the church another loan and that's what they did."

{¶70} Smith testified about his personal dealings and visit to the Hales' residence, as follows:

I had been informing Dan that we were * * * needing funding, and I believe that was part of his plan. * * * Dan told me the work had been done to that point was "topnotch." * * * He said * * * me and the wife want you to come up to our house. We got some projects at the home we want to do and * * * and we've got a plan. * * * I will tell you what it is when you get there. Have faith, is what he told me, because I kind of looked at him with an eyebrow, and like wait a minute, you're out of money and you want to look at another project? And I'm not going to sign another contract with you that you don't have funds * * * I won't make that mistake again * * * And he assured me that he would. So I went up and I * * * met him and Susan. * * * I believe Dan showed me some water stains in his ceiling * * *.

Smith identified Defense Exhibit 19, an Eagleview report done on

the Hales' home.[9]

{¶71} Smith also identified the estimate (Defendant's Exhibit 5)

which he provided for the Hales, in the total of $24,900. Smith testified the

document contained no handwriting and was not a contract. He also

identified a copy of the check (Defendant's Exhibit 20) made to his business

dated January 30, 2017 in the amount of $12,450. Smith testified there was

nothing written on the check to indicate it was for the Hales' roof job. Smith

testified:

> That's why it raised no red flags to me, as could be
> construed as anything else, when it was handed to me - -
> and I was told to take this and use it to go through Friday,
> and it was held onto on the other end and a big deal made
> out of it, I had absolutely no wild imagination, idea, that
> this would ever come back because of later unsatisfaction
> [sic] to be accused of as a criminal accusation. * * * Susan
> did her song and dance with the check, and then Dan, he
> kind of led the conversation again. He told me the loan
> was going to be completed by Thursday, and that would
> get us a day past when the loan came through, which gave
> them time to go to the treasurer and the chairman and get
> another check wrote. He also expressed he wasn't worried
> about, like, that next check coming back to him. He was
> just going to get that later from the church. After
> everything was said and done, and his main concerns were
> not letting the church know that he had invested personally
> in there. He - - he had mentioned that he already had, they
> knew a little bit, but he just didn't want the church to think

---

[9] Smith testified Eagleview is a resource for roofers and construction workers, an aerial measurement platform which measure projects. Smith used the resource to prepare his estimate for the Hales.

he was funding the full project. In actuality, he didn't want to be honest with the congregation that its loan had fallen through, because they hadn't been keeping correct paperwork for years.

* * *

My understanding was * * * the loan that he had put in it to extend our work for that week, him and Susan, up until the loan was supposed to finalize, which ultimately fell through again, being $12,450 * * *.

{¶72} Defense counsel led Smith through Joint Exhibit 1, adducing testimony about various text conversations between Smith and Dan Hale regarding both the church project and the Hales' roof job. Again, we have attempted to streamline the testimony. However, we believe inclusion of much of this testimony demonstrates the acrimony of the situation. The testimony also aided the jury's evaluation of credibility and resolution of conflicts in the evidence.

{¶73} Smith testified text number 366, dated March 1, 2017, again discussed the church's funding problems. They were going four months into the project with no money borrowed. Smith testified that Hale was saying: "I understand. I am just trying to help you the best way I can. * * * I hope you know I'm doing damage control with more people than you may know." Smith testified regarding text No. 400 as follows:

It's from Dan to me, making excuses about why he doesn't have the money. * * * They're reasons. But that should

have been handled beforehand.  It says - - it's him to me, asking me if I can give him some time to deal with this tomorrow. * * * And what it was in regards to was when - - when I first went out to do the estimate for the Sand Hill United Methodist Church, he told me, he's like, he, we're getting bids right now and we've got - - we bank with Williamstown First National. * * * And he said, we just finished a job with a contractor for the main body of the roof.  It was in excess of $300,000.  And we just paid this loan off.  Our credit is solid.  Normally, like, why even talk to somebody that doesn't have financing yet, other than a preliminary?  But he said, his financing was solid, and we're going to go ahead and write this up and he's going to get me the - - money.

Smith continued:

And then he told me he had the money, * * * Williamstown National Bank had secured them a loan.  I found out later, obviously, they hadn't. * * * But I later found out, they closed that loan ten years prior to my estimate on this project.  The way banks operate then * * * had nothing to do with the name changing.  Had them, everything to do with them trying to get a church loan in the name of - - with the business repaying it.  They were trying to use their daycare as their guaranteed source of repayment, but trying to use the benefits of the church so they didn't have to pay any interest.  And there was some title issues because of that * * * That's what I later came to learn.

* * *

So for the first time in my life, I've been hired into a contract that is legally binding.  That the customer doesn't have - - it's part of my prescreening; the customer didn't have the funds to complete the project.  Hired us to do a project they could never afford in the first place, and then begged, borrowed, and stole from every account they had - - their air conditioning fund, their vacation bible school

fund, their window fund - - and drained all of those funds making payments over this process, waiting for this loan, using accounts from this place to pay that line and vice versa.  And it was a financial fiasco. And I was having trouble justifying  staying with these people and not - - Whether, - - yes, whether I'm out there- - even a rainy day costs me money.  All that equipment sitting there, all the - - tools, the trailers. * * * .

{¶74}  Smith next read text numbers 429 - 431, dated March 13, 2017, from Dan Hale's number to Smith's number explaining about the loan delay. Smith testified about his response:

I'll read it verbatim.  I hate to say it, but I fear it's time you start looking for another source of funding. We're going to need paid this week. * * * I'm sorry, but this has been a whole lot of trouble for a loan that wasn't supposed to be any trouble.  And I'm really stressed out.

{¶75} Smith testified regarding text No. 441:

We're on strike.  That's what it says.  It says, I'm taking the crew - - from me to Dan.  I'm taking the crew to go - - tomorrow, to go secure another job where some shingles blew off a church.  * * * And he responded * * *. Remember, I've got 17 grand in this myself.  Until this loan goes through, wife and I are trying to make sure we have the money before you come to our place.  Because again at that point, he was telling me that he didn't have the money to  - - that was March 13, 2017, and he was still telling me that he did not have the money to engage on his home * * * to sign that into contract, * * * [on their home.]

{¶76}  Smith testified regarding text numbers 497-502, near the end of March 2017:

So this is Dan from me. * * *  I was pretty distraught. * * * I, being transparent again, instead of just going to a lawyer and slapping them with a breach of contract lawsuit, taking the money they had paid to that point, leaving the material in the yard, and going my separate way, I was still trying to work with them, still trying to see them through to the end.  But I told him at this point, that I don't like the situation at all. * * *  It's slowing down the rest of my year.

{¶77}  Smith testified regarding text number 512, in April 2017:

This was a nightmare.  After all that, Dan tells me that this loan is shot. * * * Like, they are starting over.  New attorney, new title on the * * * church.  And I said * * * so by starting over, are we talking like another three months, or * * * I mean, I really needed that answer. * * * I * * * couldn't hang out with them people for three more months. * * * So I wasn't going to go out and work for free for three more months and not be paid. * * * [a]nd my crew would have been in the same position.

{¶78}  Smith described the next series of texts number 524-528, which discussed the Hales' home roof project, and explained the situation near the end of April 2017:

Okay.  So Dan * * * tells me that * * * we were talking about the project that would transpire at his home.  And this is the first - - April 29th, we're going into May.  He asks - - he tells me, you took our money and I assume cashed it.  That's all we have, other than a verbal agreement.  I mean.  Then he says he wants something in writing, and I told him, I - - I sent him an estimate back then.  *He referred to it as a contract in the text messages, but that's referred to.  What's legal on the contract is a different story.*  So he asked me for - - for something in writing, and I asked him if I had already given him one, which I believed * * * I had.  And he said no.  And I told

him I'd get him one next week.  Again, it wasn't like there
was a rush on it.  *We didn't have a contract so I'd get him
a copy of that estimate I had prepared,* and then if he
wanted to make any alterations, changes, additions, or
subtractions, he could have done so.  I would have
finalized the price.  At this point, I would not have engaged
in the residential contract with him, had he not secured the
funding for the initial project he had signed and this one,
and would have had to have proven that to me, that he had
them at this point, because I - - I'm obligated and stuck in
with the church, but I'm not obligated and stuck in with
his residential.  So I wasn't ready to - - and I wasn't going
to sign anything into contract with him until he could
satisfy that.

{¶79} Regarding his business relationship with John Monk, Smith

testified:

John Monk is part of my team. * * * I do massive projects
and I don't do any of that by myself. * * * [W]e had built
a friendship over our common interest in the industry * *
*.  So with John, * * * we don't necessarily have a binding
contract or anything in paper.  * * *  When I call them and
tell them there's work to do, they react.  And likewise, they
don't have any reason or cause to hold me up for a contract
of any kind, because as everyone testified, I pay my bills
on time at the time of service.

{¶80} At the close of his direct testimony, Smith testified he still

owns his construction company and has clients, despite the five years of

prosecution.  He testified he did exactly what the Hales instructed him to do,

which was continue the furtherance of the church project and "keep their

secret."

{¶81} On cross-examination, Smith admitted that State's Exhibits F-1 through F-8, the checks paid from the church to Bottom Line Construction totaled $75,000, and that none of the church's checks were dishonored. Smith denied that the total cost of the project was $87,450 with a balance due to him of $12,450 although the church's payments including $12,450 totaled $87, 450.  The following cross-examination took place:

> Q:    Well, wasn't there a meeting at some point at the church that you were invited, and you came to the meeting to discuss what the final payment would be when you completed the job?
>
> A:    I think at that point in time, I had attended a couple of meetings to discuss their obligations and my obligations. * * * to finalize the job. I'm not sure any final payments or whatever were discussed or any figures were exchanged there.  It was mostly about them getting the money.
>
> Q:    And you had mentioned, I think at that meeting, that there was a need for you to get $10,150 and you would leave a total of $12,450 left, still due to your company when the job was completed. Do you admit or deny that conversation?
>
> A:    So I don't think it was me saying I needed that.  I believe that's what they were offering at that time to continue moving forward and they chose to withhold that amount, which - -
>
> Q:    Well, they didn't withhold the entire - - they actually paid you on September 14th  $10,150. Correct?
>
> A:    And withheld out of that last payment $12,450.

Q: All right. Now I'm going to, sort of a million dollar question. No, it's not a million dollars, it's a $12,450 question. * * * Because your testimony is that the Hales had given you $12,450. Back in January of 2017 to go toward the church job.

A: Okay.

Q: Right?

A: Right.

Q: So if that's true, and we take the eight checks that the church paid you, and add in that $12,450. You could have said, well, wait a minute. The Hales have already given me $12,450, so church, you're paid in full.

A: No.

Q: Well that's what the math is.

A: From you - - the way you're trying to twist it, yeah. But no.

Q: Now, so in point of fact, you're calling that $12,450 that the Hales gave you in January not a down payment on their home roof job, and not a business expense for the church; it was a gift to you.

A: No. No, no, no, no, no.

Q: That's what you're saying.

A: No. It- - I have said multiple times, it was to extend that week of work on the church.

Q: But that's not reflected in anything you presented

to the church, because you, after all the payments that were received by the church,

A:     Dan kept that separate.  He had - -

Q:     You - - you - -

A:     Dan kept - -

Q:     You didn't offer - -

A:     Do you want me to explain that?

Q:     - - and say, well, then that $12,450's been paid already, so the church owes me nothing.

A:     That's not exac - -

Q:     I just have to finish the job.

A:     No.  That wasn't exactly the case.

Smith continued:

> Why would I continue to finish that - - project, when they couldn't make any more payments.  They couldn't repay the Hales.  Then the Hales, you know, their - - their idea was that when they did get repaid, they would have the money then to be able to sign into contract that estimate and then we would complete that project as well. At that point, that was still the plan.  He had never told us not to do his - - his - - his house at that point.  And when the church finished and finally made their last payment, then Dan could have signed his into contract. * * *  But that - - that was not - - that opportunity was not awarded to me to make it that far.  And Dan is the one that made that call and severed that ability.

{¶82} Smith was cross-examined about Joint Exhibit 1, line 523, a conversation about the Hales' roof job as follows:

Q:     It's to Dan from you.

A:     Correct.

Q:     Correct.  And doesn't that say, did I not give you a copy yet?

A:     Yes.

Q:     And that was in response to the immediate prior question of his about wanting a contract.

A:     Right.  Well, he called it a contract.

Q:     And - -

A:     It had not been signed in yet, but I thought he meant the estimate, so I said, did I not give you a copy yet, and I told him I'd get him one next week. I mean, if it was a contract, I'd email it to you now, because I've got a copy of it.

Q:     All right.* * *Again, will you agree that that's to Dan Hale from you, Ed Smith?

A:     Yes.

Q:     And would you agree that it says, I would have to look it all up, but I did type up a contract for your roof back when we agreed to it, that I have a copy of, yes.  Will get you a copy next week.  It doesn't say, estimate. * * * I'm asking you if it says that. It doesn't say estimate.  It says - -

A:     I did repeat the exact phrase he used above, and that was my one clerical error, yes.

{¶83} The prosecutor also adduced the following testimony on cross-examination:

Q:    [I]n the contract work, the - - just somebody
       signing it wouldn't have been enough. you needed
       the 50 percent down. You needed that check for
       $33,100?

A:    Yeah, yeah.

Q:    Before you were going to consider it a contract?

A:    Correct. * * * I had given them an estimate prior to
       that but it wasn't a contract till they got the money.

2.    <u>Joshua Green</u>

{¶84} Mr. Green testified he lives in a very old large brick house once badly in need of repair. It is now on the National Register of Historic Places. Mr. Green hired Smith and Bottom Line Construction Company to complete two roof jobs for him.

{¶85} Green testified the relationship with Smith and his company was "fine," and "everything proceeded as well as it could, given the weather conditions and labor conditions during the COVID thing, and we didn't have any disagreements over any aspect of the construction project." Green testified he had a signed and initialed written agreement detailing the work that was done. The contract was separated into logical construction phases

with payments listed for each phase. As each one was accomplished, Mr. Green's wife would issue a check.

### 3. John Monk

{¶86} Mr. Monk testified he was a retired coppersmith. Monk explained that he noticed Smith's business signs, heard about Smith doing copper roofing, and struck up a friendship. Sometimes Monk received scrap copper from Smith, which he had from jobs. Smith started asking Monk for specific work to help him with jobs. Monk never had problems with Smith fulfilling his financial obligations.

{¶87} Monk made clips to hold gutters, finials, and a cross and cap for the church steeple at the Sand Hill United Methodist Church. Monk donated his time working on the cross and only requested money for the material. On cross-examination, Mr. Monk testified he is a Methodist and really liked the idea of doing a cross for the church. He had no idea if Smith passed the cost of his time for the cross onto the church. Monk testified he never had a written contract with Smith, it was all done on a handshake.

### 4. Rick Dostal

{¶88} Mr. Dostal, a building official for Washington County Building Department, manages permit processing and commercial and residential inspections for construction requiring a permit within the city

limits of Marietta.  Mr. Dostal recalled that Smith obtained a permit for repairing the steeple on the Church.  Dostal also hired Smith to install gutters on his house because Smith did good work.  Dostal had no problems with Smith and the financial arrangements.

   5.  <u>Danielle Oliver</u>

{¶89} Ms. Oliver and Smith are longtime friends.  Oliver testified the Hales were going onto Smith's business page on Facebook and saying that he was a scammer, a con artist, and to stay away from him, "he's bad business."  Oliver testified "they were very rude on their posts.  They were * * * saying like very vulgar things, just like basically criminalizing his business,* * *."

{¶90} The following exhibits were admitted or discussed at trial:

| | |
|---|---|
| State's Exhibit A | Cashier's check for $12,500 written to Ed Smith-Bottom Line Construction.  (Also Defendant's Exhibit 20). |
| State's Exhibit B | Estimate for the Hales' home roof project (Also Defendant's Exhibit 5). |
| State's Exhibit C | The top of the steeple, attachment completed by another company.  John Monk testified he made the cross and cap for the steeple. |
| State's Exhibit D | Completed photograph of the steeple.  Smith did not complete the work.  Rick Dostal testified he inspected the work. |
| State's Exhibit E-1 | Estimate for the church project, dated November |

22, 2016 (Also Defendant's Exhibit 1).

| | |
|---|---|
| State's Exhibit E-2 | Same estimate for church project as E1, with an additional $6,000 if porch is rebuilt on church (Also Defendant's Exhibit 3). |
| State's Exhibits F1-8 | Checks paid to Smith and Bottom Line Construction from the Church. Testified to by Eric Knowlton. |
| State's Exhibit H | Letter prepared by Montell Hutchison on behalf of the church council to Ed Smith. |
| State's Exhibit I | Letter to Ed Smith from church voiding the contract with Smith because work had not been performed since previous letter. |
| State's Exhibit J | Copy of letter from Hales to Smith requesting their $12,450 back. |
| State's Exhibit M | Church council minutes dated November 14, 2016. Was not admitted into evidence. |
| State's Exhibit N | Recorded phone call between Detective Huffman and Ed Smith. |
| Joint Exhibit 1 | Cellebrite extraction report containing cell phone text messages between Dan Hale and Ed Smith. |
| Defense Exhibit 1 | Original estimate to church for $60,200 for steeple project. |
| Defense Exhibit 2 | Document showing Smith was given an extra $15,500 for work in addition to the original estimate. |
| Defense Exhibit 4 | Check numbers for $4,500 for rental of a boom lift and for $1,250 for rental of metal support jacks, paid to E.S. |

{¶91} In closing, the State argued that the theft occurred because the Hales gave Smith the check for $12,450 as a down payment on the roofing job at their home, and since Smith did not perform work, purchase materials, or return the check, under the law Smith kept the down payment check beyond the scope of the express or implied consent of the Hales.  The State emphasized that any disagreement between Smith and the church was an entirely separate matter and not the issue for consideration.  The prosecutor pointed to Karen Brown and Rick Carpenter's testimony in particular.

{¶92} The defense argued in closing that the evidence showed that the money paid to Bottom Line Construction was paid to be used toward the church project, not Dan and Susan Hale's job.  Defense counsel argued there was never a contract between the Hales and Smith and nothing in the documents provided by the church reflected anything about the money being owed to the Hales.  Defense counsel pointed out that Susan Hale was present at the trial but didn't testify and argued, "I submit to you that, as Mr. Smith said in his interview with the detective, that Mrs. Hale is a good woman, an honest woman, and she couldn't get up here and lie on the stand for her husband."  Defense counsel attacked the credibility of Pastor Carpenter, Eric Knowlton, and Karen Brown arguing that there was no documentation to support their testimony.  Counsel continued:

There's a lot that was made by the state over Ed Smith using the word "contract" in some text messages where Dan Hale, towards the end of this relationship, * * * Dan Hale was saying, well, where's that contract. And Ed's like, I don't know where the contract is. You know, I've got to go look for it. I've got to find it. You can't take from that in that situation, just read it, you can't take from that that Ed Smith is agreeing there's a contract. * * * You can size up Ed Smith from his testimony, * * * and his credibility from the evidence that you saw today about his business how long he's been in business and the things that people indicated about it. You can also judge him on how he did business, what he testified about, about how he enters into contacts with clients, the steps that he took, the things that he specifically did on all of his cases to make sure things were done properly. You can easily size him up by his sincerity in the stand. * * * The State's trying to confuse you a little bit * * * they're just totaling up these numbers and saying, well, there's $12,450 extra, so that should have been given back to the Hales. But they're not counting the extra work, the extra time, the extra things that had to be done, and the fact that this money was given to him to be able to do those things, to keep those guys on that project * * *. At best, this is a civil dispute between two private parties.

 The State's rebuttal argument will be discussed below within assignment of error three.

{¶93} This court has considered Smith's claim that his theft conviction is against the manifest weight of the evidence. In doing so, we have examined the entire record, weighed the evidence, and considered the credibility of the witnesses. By the voluminous testimony which we have set forth above, it is obvious the jurors had much to consider in their deliberations. We are mindful that the jurors were in the best position to

determine the credibility of the witnesses and to resolve any conflicts in the testimony.

{¶94} What the jurors may have found less than convincing was Smith's characterization of the texts on Joint Exhibit 1, near the end of April 2017, regarding a contract. As discussed above, Mr. Hale testified Smith and he were discussing the Hales' home roof project. Mr. Hale read line 523, as a response to his request to Smith for a contract, as follows: "Okay. This is from Ed to me. Did I not give you a copy yet, question mark." The prosecutor later cross-examined Smith beginning at Line 523 on Joint Exhibit 1, text reads on Line 525: "I would have to look it all up. But I did type up a contract for your roof back when we agreed to it, that I have a copy of, yes." Smith's testimony which followed was that "he called it a contract." Smith continued, "I did repeat the exact phrase he used above, and that was my one clerical error, yes."

{¶95} Smith's attempt to downplay his reference to any "contract" as a clerical error is in contrast to his attempt to bolster his case and demonstrate his usual professional business practices and relationships through the testimony of Joshua Green and Rick Dostal. Furthermore, Smith testified on cross-examination, albeit regarding the church project, that "I had given them an estimate prior but it wasn't a contract till they got the

money." This testimony suggests Mr. Smith's belief that a contract is indeed formed when there is money placed as a down payment. The jurors also apparently found believable Karen Brown and Pastor Carpenter's testimony that they understood that Smith was to pay the Hales $12,450 once the church project was concluded.

{¶96} Based on the evidence in this matter, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice requiring reversal of Smith's conviction. Therefore, we do not find that Smith's conviction is against the manifest weight of the evidence. The eighth assignment of error is without merit. Furthermore, having found that the conviction is not against the manifest weight of the evidence, we necessarily find that sufficient evidence supports his conviction. Thus, the seventh assignment of error is also without merit. Both assignments of error seven and eight are hereby overruled.

### ASSIGNMENT OF ERROR ONE - PROSECUTORIAL MISCONDUCT AND BRADY VIOLATION

### ASSIGNMENT OF ERROR TWO - TRIAL COURT'S ERROR IN FAILING TO ORDER APPELLANT'S PROPERTY RETURNED TO HIM

### A. STANDARD OF REVIEW - BRADY MATERIAL

{¶97} One of the purposes of Crim.R. 16 is to provide all parties in a criminal case with the information necessary for a full and fair adjudication

of the facts.  Pursuant to Crim.R. 16(B), all attorneys are under a duty of due

diligence, and prosecutors are to provide or to permit copying of information

material to the preparation of a defense or intended for use by the

prosecuting attorney as evidence at trial.  *Id.*  A criminal defendant's due

process right to a fair trial is violated when the prosecution withholds

materially exculpatory evidence.  *State v. Blanton,* 2018-Ohio-1278, ¶ 88

(4th Dist.); *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *State v. Geeslin,*

2007-Ohio-5239, ¶ 7; *State v. Johnston*, 39 Ohio St.3d 48, 60 (1988).  In

order for this court to find a *Brady* violation, Smith must establish that (1)

the suppressed evidence is favorable to him, "either because it is

exculpatory, or because it is impeaching"; (2) the evidence was suppressed

by the State, "either willfully or inadvertently"; and (3) that "prejudice * * *

ensued."  *State v. Bethel,* 2022-Ohio-783, ¶ 19, quoting *Strickler v. Greene*,

527 U.S. 263, 281-282 (1999).  The defendant bears the burden of proving

that a *Brady* violation rises to the level of a denial of due process.  *State v.*

*Allen,* 2016-Ohio-7045, ¶ 11 (8th Dist.).  [F]avorable evidence is material,

and constitutional error results from its suppression by the government, "if

there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different."  *Bethel* at ¶

19, citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), quoting *United States*

*v. Bagley*, 473 U.S. 667, 682 (1985).  Whether withheld evidence is material

under *Brady* is a matter of law for which the de novo standard of review

applies.  *Allen* at ¶ 11.  De novo review requires an independent analysis of

the record without deference to the trial court's decision.  *Demeraski v.*

*Bailey,* 2015-Ohio-2162, ¶ 11 (8th Dist.).

B.  LEGAL ANALYSIS

  1. <u>Electronic devices.</u>

{¶98} Smith contends the State committed prosecutorial misconduct

by a violation of *Brady* when it refused to turn over his seized property—

electronic devices containing exculpatory evidence necessary to his defense.

These devices were his iPhone, iPad, and Apple Mac computer.  In his brief,

Smith describes these devices as containing "material that was critical for

either disclosure or review * * *.  Specifically, emails and text messages

with the church that go to the crux of Mr. Smith's defense, including his

ability to provide a proper timeline of events."  Based upon the following,

we disagree that the prosecutor's actions amounted to misconduct or a *Brady*

violation.

{¶99} The record reflects that on December 16, 2021, counsel filed a

Motion to Disqualify Prosecuting Attorney and Motion to Return Seized

Property.  At the time, Smith acknowledged that his devices had been seized

pursuant to a search warrant originating from and executed within Noble County, where Smith resided. Smith has not challenged the lawfulness of the search warrant. Smith's initial motion sought return of these items on the basis that they contained privileged material between himself and his attorney.[10] Smith's counsel argued that even if the information obtained from the devices was not used by the State at trial, the information would provide access to the defense theory of the case.

{¶100} On December 27, 2021, counsel filed another Motion to Compel Return of Defendant's Laptop and Phone, again arguing that the devices contained privileged material critical to preparation of his defense. In the motion, Smith stated that the information obtained by the Noble County search warrant had been communicated to the Washington County Prosecutor. The trial court addressed the December 16, 2021 motion at a January 4, 2022 hearing, finding as follows:

> The Court finds that none of the property seized from Defendant pursuant to a Search Warrant issued in Noble County, in 2021 and that none of the information obtained from that seized property pursuant to a Search Warrant issued in Washington County, Ohio, will be used as evidence in the instant Case against Defendant Smith. Therefore, the Court DENIES Defendant's Motion for the Return of Seized property from Defendant by the Washington County Sheriff.

---

[10] Smith also noted that he was the subject of cases in Noble County which involved the Washington County Prosecutor, Nicole Tipton Coil, as an alleged victim of crime and for that reason, sought her disqualification in his Washington County theft case.

{¶101} On June 6, 2022, counsel filed a Second Motion to Compel Return of Defendant's Laptop and Phone.[11]  Smith  again asserted that these devices contained information necessary to assist him in preparing for trial, and possible impeachment evidence.  For the first time, Smith alleged a *Brady* violation.  At hearing on this motion on June 8, 2022, defense counsel argued:

> [I]'ve been trying to get these things back for some time, and the Court gave me time to get it back the last time, and I've just struggled to try to get anything back.  And you know, from my client's perspective, that it's a strategic device being employed by the State to keep him deprived of information that's potentially helpful in his defense and potentially exculpatory.  *I can't tell the Court, because I've never gone through all these devices, exactly, what's on them.*  I can tell the Court what my client believes is on them, which is, you know, business records, things that document the things that were going on at the time of this case, that would be helpful in defense.  *But you know, I don't have real specifics about them because I haven't seen them.* * * * It's been nine months since they've been seized.  There's been no criminal charges forthcoming. * * * I mean, nothing is happening with these devices, and yet I still can't get either the information from them or the devices themselves to use in my client' s defense. * * * It's my understanding that the information was downloaded and it was sent with the devices to the AG's office.

{¶102} The State responded that if needed, two officers would testify that they had conversations with Attorney Summers and with the defendant

---

[11] Although the motion is captioned as a second motion, it is actually a third one.

that if Smith would provide the passwords, they could download the information, copy it, and give the devices back, "and they've refused to do that."  The prosecutor indicated that the computer was with the FBI office in Athens and the devices were in the Sheriff's Office but the Attorney General wanted to hold them as evidence.  In the meantime, the prosecutor expressed concern that "if the items were returned to Smith, he would delete items critical to the investigation. * * * There were ways to accomplish what defense counsel wanted to accomplish, but he hasn't done so although he had six months."  By Journal Entry of June 22, 2022, the trial court denied Smith's motion.

{¶103} As part of the State's response on appeal, the State points out that Smith's first attorney provided discovery responses on May 22, 2020 and June 3, 2020, which included copies of various business documents and correspondence between Bottom Line Construction and the church.  Yet Smith's response did not include copies of any emails or text messages.  The prosecutor also pointed out that Smith's trial attorney was appointed on July 23, 2021, and Smith's devices were not seized until October 14, 2021.  Moreover, the State contends that Smith has not shown how the evidence on the devices is exculpatory and would tend to exonerate him.

{¶104} We agree with the State.  First, we cannot find that the evidence contained on Smith's devices was willfully or inadvertently suppressed by the State, as it appears that Smith retained possession of his devices subsequent to his indictment in September 2019 and prior to the October 14, 2021 execution of the search warrant, over a two-year period. Common sense would indicate that Smith should have reviewed his devices for materially exculpatory information at some point during that time period and especially, once his first trial date was scheduled for March 19, 2020. Even after the property was seized, the record indicates that Smith was given opportunity to work with the State to retrieve the information contained on his devices and failed to make any attempt.

{¶105} Key, however, to resolution of this issue is that Smith has not established that the evidence he claims was on his devices was favorable to him, i.e., is materially exculpatory.  Smith's attorney argued that he himself was not aware of what was on the devices.  Smith has not shown that the evidence constitutes impeachment.  Without more, we are left to speculate whether the evidence complained of would be exculpatory to Smith.  *See State v. Jennings*, 2000 WL 873390, *4 (5th Dist.)  Under these circumstances, we cannot find a *Brady* violation as a result of the State's conduct.

2.     Church meeting minutes.

{¶106} Smith also contends the State violated the discovery rules and

*Brady* by withholding documentation of minutes from a meeting at the

church, State's Exhibit M, which bore directly on the issue of his guilt and

of the credibility of the State's key witness, Dan Hale. Smith directs us to

Hale's cross-examination when defense counsel asked Mr. Hale if he had

any documentation confirming he had made a loan to the church. On re-

direct, the prosecutor used the church meeting minutes to refresh Mr. Hale's

memory. Defense counsel argued if the document had been disclosed, it

would have changed a significant part of his defense. Counsel argued, "[I]n

my opening statement, I indicated that the sum total of the money that we

believe Dan Hale gave to the church was $16,000 * * * almost $17,000 * *

*. So If I'd have known that then, I'd have never made that argument." As

the State has pointed out, Smith did not object so we review the alleged

violation for plain error.

{¶107} The matter was taken up at sidebar. This exchange occurred:

Prosecutor: Mr. Summers asked as part of his cross-
examination about an actual document, did Mr. Hale
have, confirming that he had made a loan with the church
since he testified about that. There's been testimony
already from Eric Knowlton that the church got money
from him and the church paid him back, but there's been

no documentation of it. * * * I understand Mr. Summers
is going to object because he did not get it in discovery,
and that's correct.

The Court:   So you believe there was no loan from
                   Mr. Hale to the church?

Atty. Summers:  I question whether or not there was this
loan.  I know that he gave money to the church on several
occasions, and loaned money out to cover the church, but
this document, I didn't have.

{¶108} The transcript reflects that the Prosecutor represented to the

court that the information contained in the document was part of the police

report, which was copied and supplied to defense counsel, but not the actual

document that constituted State's Exhibit M.  The Court seems to indicate it

did not find the exhibit problematic, stating:

I think * * * based on the representation that those
minutes were given in discovery and also the fact that
they were mentioned in somebody's direct examination *
* * that the family was going to loan * * * that the Hales
did. * * * But I think at this point, to avoid any unfair
prejudice to the defense, I'm not going to admit this. But
I believe you can ask him about those minutes and the
loan made to the church.

{¶109} When Dan Hale testified on redirect, he reviewed Exhibit M

and acknowledged it was the church meeting minutes dated November 14,

2016.  Reading verbatim, Mr. Hale testified:

We need $16,100 to make the down payment.  It was
announced that a family from the church will loan $17,000
through a home equity loan to the church so we can make

the down payment by December 1. * * * A letter of agreement for the family and the church was requested to be notarized.

{¶110} Based upon our review of the entire trial transcript, we do not find this document to be materially exculpatory evidence. Rather, the testimony regarding State's Exhibit M demonstrates that the information contained in the exhibit was cumulative to an extrinsic matter, the Hales' loan to the church for the down payment on the church's contract with Smith. Mr. Hale testified on direct that he and his wife loaned the church money for the initial down payment to Smith. Eric Knowlton also testified to this knowledge. The Hales' loan of money to the church on the church's contract with Smith has nothing to do with the Hales' accusation of theft of $12,450.

{¶111} Moreover, the Supreme Court of Ohio has held " '*Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence. * * * In such a circumstance a trial court has authority, pursuant to Crim.R. 16[(L)(1)], to * * * make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded.' " *State v. Brown,* 2023-Ohio-3017, ¶ 54 (11th Dist.), quoting *State v. Iacona*, 93 Ohio St.3d 93, 100 (2001).

{¶112} At the sidebar conference discussing Exhibit M prior to its use at trial, defense counsel advised the trial court that he knew the Hales had loaned money to the church on prior occasions. In fact, in his opening statement, defense counsel used the numbers "$16,000 or $17,000." That the number was set forth in the church meeting minutes cannot have been previously unknown to Smith and his counsel. Thus, Smith's defense strategy would not have been prejudiced by the State's failure to disclose the document. Based upon our review, we cannot find a *Brady* violation prejudicing Mr. Smith.

{¶113} Based upon the foregoing, we find no merit to Smith's first assignment of error. It is hereby overruled.

## C.  STANDARD OF REVIEW- RETURN OF PROPERTY

{¶114} Smith asserts that the trial court erred by failing to order that his electronic devices be returned to him. His first two motions for return of his property, an iPhone, iPad, and Apple Mac computer, characterized his arguments as claiming a violation of the discovery rules. As noted above, the trial court may make orders regulating discovery pursuant to Crim.R. 16(L). "[A] trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of

the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), at

paragraph two of the syllabus.  A trial court has discretion in determining a

sanction for a discovery violation.  *See State v. Lincoln,* 2018-Ohio-1816, ¶

17 (4th Dist.); *State v. Parson*, 6 Ohio St.3d 442, 445 (1983).  A trial court

abuses its discretion when it makes a decision that is unreasonable,

unconscionable, or arbitrary.  *State v. Adams,* 62 Ohio St.2d 151, 157

(1980).  Here, as previously discussed, the trial court inquired into the

circumstances surrounding the State's alleged violation of the discovery

rules and did not find a violation.  While the prosecutor represented that the

State did not intend to use the materials on the devices as evidence, the

devices are fairly described as potential pieces of evidence.  It is well-

established that evidentiary rulings are also within the sound discretion of

the trial court.  *See State v. Thompson,* 2018-Ohio-4690,  ¶ 17.

## D.  LEGAL ANALYSIS

{¶115} As noted above, as to the first two motions, the trial court

found that none of the property seized by search warrants in Noble and

Washington Counties was going to be used as evidence in Smith's theft trial

herein.  R.C. 2981.11(A)(1) provides:

> Any property that has been * * * seized pursuant to a
> search warrant, * * * and that is in the custody of a law
> enforcement agency shall be kept safely by the agency,
> pending the time it no longer is needed as evidence or for

another lawful purpose, and shall be disposed of pursuant to sections 2981.12 and 2981.13 of the Revised Code.

Smith has not disputed that his devices were seized pursuant to a search warrant properly issued in a criminal investigation. In *State v. Bates,* 2021-Ohio-1397 (6th Dist.), Bates sought return of his laptop computer that had been seized in the execution of a search warrant. Bates' indictment had been dismissed without prejudice. Bates' petition for return of the computer occurred several months after the dismissal.

{¶ 116} Citing R.C. 2981.11(A)(1), the Second District Court noted:

Although this provision is part of the law of forfeiture, it is applicable to any property seized in the execution of a search warrant and held prior to its final disposition. It also sets circumstances during which such property should be held. If an item is potentially needed for evidence or for some other lawful purpose, it may be held. Alternatively, if the item is no longer needed, it may be returned or otherwise disposed.

*Bates,* at ¶ 14. The court continued:

Logically, items being held as part of a criminal investigation are being held to be used as evidence or for the lawful purpose of assisting the investigation. If, during consideration of a motion for return of property, the court properly finds that seized property is being held for evidence or as part of an ongoing investigation, it may properly deny the motion.

*Id.,* at ¶ 15. The *Bates* court held that since the computer at issue was being

held for evidence and to aid an ongoing investigation, the court was within

its discretion in denying the motion for its return.

{¶ 117} The trial court denied Smith's third motion, finding as

follows:

> With respect to the motion to return the electronic devices,
> * * * those are at least in the custody of, allegedly, the FBI,
> Washington County Sheriff, but at least under the auspices
> of the Attorney General's Office - - for that part of the
> investigation, and * * * they're not a party to this case, so
> I don't have the jurisdiction to order them to return to me.
> * * * Furthermore, it sounds to me like * * * if the
> passwords were given, those devices could have been
> copied and they could have been * * * back in your hands
> for review.

Based on our review of the record, we find the trial court did not abuse its

discretion in denying Smith's motion for return of his electronic devices. At

the time of Smith's request, it appears that the property was still being held

by the Attorney General's Office for a lawful purpose, an active

investigation. As previously discussed, Smith has not shown that

information contained on his devices was materially exculpatory.

Furthermore, as previously discussed, it was Smith's own lack of diligence

in retrieving the information long before the first trial date was established,

along with his later lack of cooperation in providing passwords, which could

have resulted in the devices being returned, which caused his inability to

regain possession of the items.  Based on our review of the record, including the information and status of the case at the time the trial court issued its final ruling denying Smith's motion, we cannot say that the trial court abused its discretion in doing so.  Accordingly, the second assignment of error is without merit.  It is hereby overruled.

### ASSIGNMENT OF ERROR THREE - PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENTS

### A. STANDARD OF REVIEW

{¶118} " 'The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial.' " *State v. Benge*, 2021-Ohio-152, ¶ 54 (4th Dist.), quoting *State v. Jackson,* 92 Ohio St.3d 436, 441 (2001), citing *State v. Apanovitch,* 33 Ohio St.3d 19, 24 (1987); *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993).  Therefore, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Powell,* 2020-Ohio-2577, ¶ 149, quoting *Smith v. Phillips,* 455 U.S. 209, 219 (1982).  Further, the Supreme Court of Ohio has found that prosecutorial misconduct constitutes reversible error only in " 'rare instances.' " *Keenan* at 405, quoting *State v. DePew,* 38 Ohio St.3d 275, 288 (1998).

{¶119} In this case, Smith's counsel did not object to the prosecutor's remarks during trial.  Therefore, we review only for plain error.  Pursuant to

Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under the plain-error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *State v. West,* 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman,* 2014-Ohio-4034, ¶ 16.

## B.  LEGAL ANALYSIS

{¶120}  *"As a general matter both the prosecution and the defense have 'wide latitude during opening and closing arguments.' "  State v. Groves,*  2022-Ohio-443,  ¶ 66 (4th Dist.), quoting *State v. Canterbury,* 2015-Ohio-1926, ¶ 22 (4th Dist.).(Internal citations omitted.)  Herein, Smith argues that the State improperly expressed its personal opinion as to the credibility of the witnesses, as well as to the guilt of Mr. Smith.  Smith argues that all the prosecutor's comments were prejudicial to him and impacted the jury's determinations because the case hinged entirely on credibility.  Smith concludes that the allegedly improper remarks prejudicially affected Smith and infringed upon his substantial constitutional rights.

{¶121} In the first group of comments, Smith contends that the

testimony which the prosecutor refers to occurred because Smith was unable to remember details due to the passage of time. Smith argues that the prosecutor's remarks were unsupported by evidence or testimony and were insinuations and assertions calculated to mislead and to imply that Smith was lying. The comments are set forth as follows:

> And then he started talking about all this extra work, this work that, you know, all the extra work was contracted in, and even what's funny is, when we were talking to Mr. Monk about whether or not that work he did, that he did for free, Mr. Schneider then asked Mr. Smith, well, did you charge the church for that work, for that overtime, or for that – those hours of labor? And he couldn't even answer that question. Why? Because we all know what the answer is. Yeah, he charged the church for that labor and then he tried to say he put it in other parts of the church. But he never even said what parts of the church he put that labor into, that labor cost. He couldn't give you an answer. He can never give you a straight answer, when he knew he couldn't tell you the truth.

{¶122} A prosecutor may not express a personal belief or opinion as to a witness's credibility. *State v. Hayes,* 2020-Ohio-5322, ¶ 43 (1st Dist.), citing *State v. Myers,* 2018-Ohio-1903, ¶145. However, a prosecutor may comment on "considerations that the jury could properly consider in evaluating [a witness's] credibility: his demeanor, consistency, and opportunity to observe, as well as the extent to which other evidence corroborated his testimony." *Id.* at ¶ 147. Based upon our review of the trial

transcript, we do not view the prosecutor's comments as stating a personal

belief as to credibility. Rather, the prosecutor's comments challenged the

jury to consider the consistency of Smith's testimony, i.e., the fact that

Smith seemed to remember many aspects of the two projects in great detail,

especially his dealings with Mr. Hale during both projects, but was,

supposedly, unable to recall specifics as to dealings with John Monk. The

prosecutor's comment about Smith's inability to give "a straight answer" is

not a personal opinion but a comment upon the believability of Smith's

testimony. *See State v. Johnson,*1999 WL 1071686, *6 (5th Dist.).

Furthermore, even if we somehow viewed this as error, it would not rise to

the level of plain error, given that the discussion regarding Mr. Monk was

related to an extrinsic matter and not the ultimate issue at trial.

{¶123} Smith next argues that the State improperly hypothesizes on

why defense counsel did or did not ask certain questions:

> And when Mr. Monk was on the stand, he talked - - and
> it was interesting because the Defense never asked him
> if they engage in contracts, because they didn't want to
> ask him that, because they knew he doesn't engage in
> contracts written down with Mr. Smith. He said Oh,
> no, we just use handshake, you know. It's a man's
> word. That's what Mr. Monk said.

{¶124}The prosecutor is permitted to fairly comment upon the

testimony and evidence, and the inferences to be drawn.  *See State v. Ralston,* 2017-Ohio-7057 ¶ 40 (4th Dist.); *Canterbury, supra*, at 31;  *State v. Mundt,* 2007-Ohio-4836, ¶ 119.  *Canterbury, supra,* at ¶ 25.  In this case, Smith testified that he had a contract with the church, essentially, because he had a signed writing and acknowledged receipt of payments from the church.  Mr. Smith indicated that was his way of doing business, to always have a signed contract.  Smith also called John Monk as a witness and discussed their business relationship.  It appears that the prosecutor was simply countering Smith's argument, throughout trial, that he always used written contracts.  We find these remarks to be fair commentary upon the evidence.

{¶125}In the final group of remarks, Smith argues the State made impermissible suggestions based on the prosecutor's observations, which were intentionally designed to mislead the jury.  The remarks are as follows:

> And like I said, I had been observing Mr. Smith.  That moment, right before that, he thought he was hitting all sorts of points with that witness.  He had the biggest smile on his face, when that guy was testifying.  As soon as Mr. Monk said, no, it's about handshakes, that smile left his face faster than his defense left this courtroom, because he knew it was over.  He knew that everyone else knew that he does contracts orally as well as written down.

{¶126} " 'A defendant's face and body are physical evidence.' " *State v. Williams,* 2020-Ohio-1228, ¶ 37 (1st Dist.), quoting *State v. Brown,* 38 Ohio St.3d 305, 317 (1988).  A prosecutor may comment on the defendant's physical appearance, demeanor and body language during trial.  *State v. Green,* 90 Ohio St.3d 352, 373 (2000); (citation omitted.)  *See also State v. Ladson,* 2018-Ohio-1299, ¶ 38 (8th Dist.), (While finding no impropriety in the prosecutor's remarks, recognizing that some appellate courts have found prosecutor's comments about a defendant's demeanor to be improper).

{¶127} Any " '[p]rosecutorial misconduct rises to plain error only if it is clear that a defendant would not have been convicted in the absence of the improper comments.' " *Canterbury, supra,* at ¶ 19, (internal citations omitted.)  We are also mindful that when reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial.  *See State v. Waters,* 2014-Ohio-3109, ¶ 33 (4th Dist.); citing *Darden v. Wainright,* 477 U.S. 168 (1986).  *See also State v. Hall*, 2014-Ohio-2959, ¶ 47 (4th Dist.).  In this case, the idea that the State's comments alone led the jury to find Smith guilty is speculative at best.  Therefore, we find no impropriety in the comments.  *See State v. Talley*, 2016-Ohio-8010, ¶ 40 (6th Dist.).

{¶128} Based upon a review of the record and within the context of

the entire trial, we cannot conclude that the statements by the prosecution, when reviewed under a plain error standard, rose to the level of prosecutorial misconduct. In other words, we cannot say Appellant would not have been convicted in the absence of the statements. Furthermore, the trial court instructed the jury that the closing arguments of counsel are not evidence, and we presume that jurors follow the court's instructions. *State v. Noling,* 2002-Ohio-7044, *see e.g., State v. Williams,* 73 Ohio St.3d 153, 159 (1995). Accordingly, Smith's third assignment of error is hereby overruled.

## ASSIGNMENT OF ERROR FIVE - JUROR MISCONDUCT

## ASSIGNMENT OF ERROR SIX - INEFFECTIVE ASSISTANCE OF COUNSEL

{¶129} Because Smith's arguments in these assignments of error are interrelated, we consider them jointly. Under the fifth assignment of error, Smith contends that the trial court erred by failing to dismiss a juror who was observed communicating with one of the State's witnesses. For the reasons which will follow, we disagree.

### A. STANDARD OF REVIEW - JUROR MISCONDUCT

{¶130} " '[W]hen integrity of jury proceedings is in question, a court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." ' " *State v. Lee*, 2018-Ohio-3957, ¶ 23 (10th Dist.),

quoting *State v. Lang*, 2011-Ohio-4215, ¶ 54, quoting *Remmer v. United States,* 347 U.S. 227, 230 (1954).  An inquiry into alleged juror misconduct requires a two-step analysis.  *State v. Marshall*, 2007-Ohio-6298, ¶ 57 (4th Dist.).  "First the trial court must determine whether misconduct occurred. (Internal citation omitted).  Then, if juror misconduct is found, the court must determine whether the misconduct materially affected the appellant's substantial rights." *State v. Coleman,* 2006-Ohio-3200, ¶ 10 (4th Dist.). When a juror forms an opinion as to guilt or innocence before all the evidence is presented, such activity constitutes misconduct.  *See State v. Combs,* 2002-Ohio-1136, *3 (5th Dist.).  "Trial courts are given broad discretion when dealing with allegations of juror misconduct.  (Internal citation omitted).  Thus, its decision when faced with such allegations must be reviewed for an abuse of discretion." *State v. Robinson,* 2007-Ohio-3501, ¶ 96 (7th Dist.).

{¶131} In this case, it was brought to the trial court's attention that Juror Smith and Mr. Hale held some sort of conversation on a break.  The trial court conducted a hearing in chambers.  At the conclusion of the hearing, Smith did not interpose any objection or move for the juror's removal.  Once again, where the complaining party fails to object to the trial court's failure to question a juror or decision to not disqualify a juror for

misconduct, an appellate court may notice a "plain error" although it was not

brought to the attention of the court.  *Lee*, at ¶ 26; *Thompson* at ¶ 73; *State v.*

*Keith*, 79 Ohio St.3d 514, 528 (1997); *State v. Frazier*, 2007-Ohio-5048, ¶

107; *State v. Clark,* 2014-Ohio-5101, ¶ 23 (10th Dist.).

## B. LEGAL ANALYSIS

{¶132} During the hearing in chambers, the trial court inquired as

follows:

| | |
|---|---|
| The Court: | So, and, again, this is because the reason we give you these admonitions about not talking to people, not contacting someone, there was a report that you had a conversation with Mr. Hale, the witness, while – |
| Juror Smith: | Right. I was just asking him about - - |
| The Court: | In line at the, downstairs.  If you wouldn't mind just recounting that conversation, so that everybody know what - - what was talked about. |
| Juror Smith: | I, I just said, I heard or he said something about him being, chief of the fire department, told him I had an uncle on the fire department, just mentioned who it was.  I said, he's a pretty good guy.  And that's all I said. |
| The Court: | Okay.  There were no discussions about this case? |
| Juror Smith: | No. |

The Court:            Okay. Attorney Schneider, do you have any inquiry for Mr. Smith?

Attorney Schneider:   I do not. Do you?

The Court:            Attorney Derkin.  Attorney Summers?

Mr. Schneider:        Other than, well, I - - either we can ask or I would assume the Court would ask, does anything about that cause him - -

The Court:            Oh.  Because you had that  discussion with him, does that change your opinion of the case and have - - and either bias the case toward the State and against Mr. Smith or the other way?

Juror Smith:          No.

The Court:            Okay.  Attorney Summers?

Attorney Summers:     I was just trying to explain to my client the jury situation.  So you, as the Court said, were basically told not to do what you did.

Juror Smith:          Yeah.

Attorney: Summers:    And he had - - he had told you, gave you that admonishment now to not do it again.  But I guess the question that my client would like to know is, you know, why would you even strike up that conversation with him?  I mean, that obviously gives you - - I mean,

there's something about what you asked him, you have some connection to him, because he was a firefighter and so our fear is that because of that, and because you know that your uncle's a firefighter and he's a good guy, as you testified to today, that somehow you're going to take his testimony and - - favor it over or give it greater weight than testimony of anybody else.  I mean, you can obviously do that within the courtroom setting because of the way people testify, but if you use this sort of exterior thing that you bring into the courtroom, that's a problem for us. So why did you even ask that question in the first place, knowing what - -

Juror Smith:  I don't know.  Actually, the guy just married my aunt.  He's not even really my uncle, other than by marriage.

Attorney: Summers:  Okay.  But my question is, why would you – I mean, why would you even start that conversation up with him?

Juror Smith:  I don't know.  Just more or less, like, how you doing?  I mean, I didn't mean anything by it.

The Court:  And again, for the record, they - - everyone was standing in line waiting for food at the commissary downstairs. Correct?

Juror Smith:  Right.

Attorney  So that you're - - you're saying that

| | |
|---|---|
| Summers: | it's not going to affect your ability to render an impartial verdict according - |
| Juror Smith: | No. |
| Attorney Summers: | - - to the law and the evidence presented in the case? |
| Juror Smith: | Not at all. |
| Attorney: Summers: | Okay. Thank you. |

* * *.

| | |
|---|---|
| The Court: | We appreciate your candor. * * * Anybody wish to put anything on the record. |
| Attorney Schneider: | The State has nothing. |
| Attorney Summers: | We don't have anything, Your Honor. * * * We're not going to make any motions or anything to take him off. |
| The Court: | All right. Thank you. And- - and the Court does find that, based on the statements of both parties, they did not - - anyway my instruction was, you are cautioned not to discuss the case amongst yourselves or anyone else, not to read - - and again, do not do any of the prohibited items contained in my admonition. |

{¶133} It is unclear from the transcript whether the trial court actually made a determination that misconduct occurred. Ultimately, the trial court did not remove Juror Smith. Juror misconduct does not necessarily require reversal in all cases. *See Marshall, supra,* at ¶ 61.

{¶134} Based on the foregoing, we cannot find that the trial court's failure to sua sponte remove Juror Smith constituted error or plain error. While an explicit finding of misconduct was not made, Juror Smith was questioned and his response indicated that the conversation with Mr. Hale did not affect his ability to render an impartial verdict. There is no evidence to suggest that Juror Smith formed an opinion as to guilt or innocence before all the evidence was presented, as required for a finding of misconduct.

{¶135} Even if the court had found the communication to be juror misconduct, again based on Juror Smith's representation to the court, we cannot find that the supposed misconduct materially affected Smith's substantial rights. Based on the foregoing, Smith's fifth assignment of error is without merit and is hereby overruled.

## C. STANDARD OF REVIEW - INEFFECTIVE ASSISTANCE

{¶136} To prevail on an ineffective assistance claim, a defendant must show: "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable

representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Colonel,* 2023-Ohio-3945, ¶ 60 (4th Dist.); *State v. Short,* 2011-Ohio-3641, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). Failure to satisfy either part of the test is fatal to the claim. *Strickland* at 697, 104 S.Ct. 2052. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor,* 2006-Ohio-6679, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955); *State v. Conant*, 2020-Ohio-4319, ¶ 28 (4th Dist.).

## D. LEGAL ANALYSIS

{¶137} Based on our finding that the trial court did not abuse its discretion nor commit plain error by failing to dismiss Juror Smith, we cannot find that Smith's counsel's failure to object or otherwise move for dismissal constitutes deficient performance. Again, based on Juror Smith's representation to the court that the conversation did not affect his opinion of the case or affect his ability to be fair and impartial, even had such an

objection or motion been made, it is not likely to have been granted. Any objection or motion would likely have been futile. "The law does not require counsel to take a futile act." *Conant, supra,* at ¶ 30. Smith's counsel's performance was not deficient for failing to make objections to or move to dismiss Juror Smith. Accordingly, this argument is without merit and we overrule Smith's sixth assignment of error.

ASSIGNMENT OF ERROR NINE - CUMULATIVE ERROR

A. STANDARD OF REVIEW

{¶138} Under the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), citing *State v. DeMarco,* 31 Ohio St.3d 191 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith,* 2016-Ohio-5062, ¶ 106 (4th Dist.), quoting *State v. Harrington*, 2006-Ohio-4388, ¶ 57 (4th Dist.).

{¶139} The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *State v.*

*Mammone*, 2014-Ohio-1942, ¶ 148; *State v. Fannon,* 2018-Ohio-5242, ¶ ¶ 124-125 (4th Dist.); *State v. Thacker,* 2021-Ohio-2726, ¶¶ 69-71 (4th Dist.).

{¶140} Smith argues that cumulative errors violated his constitutional right to a fair trial. However, because we found no errors, the cumulative error doctrine does not apply. *Mammone, supra,* at ¶ 173; *State v. Maxwell*, 2014-Ohio-1019, ¶ 253; *State v. Ludwick*, 2022-Ohio-2609, ¶ ¶53-57 (4th Dist.) (citation omitted.) Accordingly, the ninth assignment of error is also overruled.

{¶141} Having found no merit to any of Appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J., concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**